### Same Case on a Re hearing.

In the absence of any previous communication between the creditor and the surety, the creditor binds himself to nothing.

The legal consideration of the contract of suretyship is to be found in the service rendered to the principal; and if the principal contract be valid, the law looks only to the presumed beneficence of the surety as the cause of his obligation, and therefore holds him bound, no matter how unfounded may have been the interior motives of interest or confidence which led to the act of beneficence.

Such of the assets sold as did not exist in the shape described by *Marchais*, yet existed in claims of the same amount upon himself for undetected embezzlements. The principal contract was not, either wholly or in part, affected with nullity; and being good and valid, the validity of the collateral undertaking follows.

The consideration of a contract does not pass to the surety. His obligation arises from the consideration received by his principal.

Where no communication is shown to have taken place between the creditor and the surety, and no actual or constructive fraud is attributable to the creditor, and there has been no discharge subsequent to the contract, the liability of the principal is the test of the liability of the surety.

THE following argument for a re-hearing was filed by *C. A. Johnson* and *George Eustis* :

The assets sold amounted to some $80,000. The deficiency proved, according to the opinion of the District Judge, amounted to upwards of $23,000. The alleged deficiency was upwards of $34,000, and this amount is pleaded as a reconventional demand by the defendants, in the event of a legal sale having been made to *Marchais*, the plaintiffs being bound to make good this sum by reason of their warranty as vendors.

The precise amount of the deficiency not having been ascertained at the trial, it was agreed that in the event of its being material under the opinion of this court, the cause should be remanded for the purpose of fixing it.

The amount may be assumed to be considerably less than one-half the price and value of the assets; and admitting that there was a failure of consideration for so much, are not the defendants bounds for the balance, for the price of the assets sold, and which existed in kind, and of which the purchaser had the benefit? Does this partial failure of consideration exonerate the defendants from the whole contract?

To produce this result, something more would seem to be necessary than mere partial failure of consideration. Whether there be any such cause will be manifested by an examination of the whole subject.

A sufficient cause would be fraud on the part of the Bank. On this matter the court distinctly and unequivocally says that the charge of fraud in the concealment of material facts from the defendants, which, if known, would have prevented their assuming the responsibility, is entirely unsupported by any evidence, and no attempt has been made to sustain it in this court.

It seems to be plain that error could only invalidate the contract to the extent of the error. There was no error as to the greater part of the assets and the banking-house. They inured to the benefit of the principal, and are lost to the plaintiffs, except the amounts received in payment. Error cannot be predicated of them. There was error as to the probity of *Marchais*, an error into which sureties are apt to fall, and to save creditors from the consequences of such an error the contract of suretyship was invented.

It is believed that the correctness of the exposition of the law of suretyship, contained in the printed argument of the undersigned, is not contested. It is understood as being conceded by the court. The only questions that arise relate to its application to the facts of the case. In relation to the application of the law, as made by the court, the present remarks are submitted.

A mere criticism of a judicial opinion is to be avoided in an argument of this kind; it indeed is no test whatever of the soundness of the opinion in its result. The views presented by the undersigned are offered in the spirit in which investigations of this character are to be conducted, having for the object the maintenance of legal principles and of legal rights.

The main ground for which it is supposed that the plaintiffs cannot‾recover is, that the defendants became sureties only for the fulfilment of an obligation arising out of a contract of sale; that this sale is null, by reason of its wanting an assential element of the contract of sale; and that it is also voidable by reason of error on the part of the plaintiffs and defendants in relation to the thing sold.

As a consequence, it is said that the obligations of the defendants cannot be extended beyond the contract of sale, also that the plaintiffs are bound to the defendants by the ordinary warranties of vendors.

These views we understand to be the basis of the decision of the court. The reasoning of the court, in its different forms and propositions, is all reducible to these elements, which involve the whole subject of inquiry. These several propositions, as we have been able to collect them from the opinion delivered, we will now proceed to set forth and consider in detail.

It is held by the court:

1st. That if the sureties were to be held liable, it would not be for an obligation arising out of the contract of sale, but for the loss previously sustained by the Bank, and that it would be an extension of the obligation of the sureties beyond the contract in relation to which they bound themselves.

2d. That there was no sale for the want of a thing sold.

3d. That there was error, both on the part of the plaintiff and the defendant, as to the consideration of the sale, and that the case turns on the question whether the defendants, as sureties, can avail themselves of the plea of error and want of consideration. That if the transaction is to be regarded in the light of a contract between the sureties and the Bank, the error was on a point which was a principal cause of making the contract. That it is sufficiently established by the nature of the contract and by the previous negotiations, that the defendants were directly privy to the principal contract, or, in other words, that the plaintiffs warranted to the sureties the existence of the thing sold.

I. The first proposition, to wit: that if the sureties are held liable, it will be, not for an obligation arising out of the contract of sale, but for a loss previously sustained by the Bank, involves an assumption of fact that is not sustained by the record. It takes for granted that the Bank had no security for the conduct of *Marchais*, as cashier, and that consequently the loss resulting from his embezzlement must have fallen upon the bank. Now not only is such an assumption totally unsupported by the record, but the presumptions are all the other way. The plaintiffs' charter (Acts of 1832, page 68, sec. 35) provides that the cashiers of the branches shall furnish security to the satisfaction of the directors of the mother Bank. That such security was furnished in the present case may be fairly assumed, first, from the notorious usage of banks in this respect, as the records of the court abundantly show, and second, from the presumption that the injunctions of the charter were obeyed, and that the directors, six of whom were State directors, and consequently public officers, did their duty. The lower court, in its opinion, assumes that security *was* furnished, and this of itself authorizes us to say that the fact was not questioned at bar. In the absence of any evidence whatever upon this question of fact, and with the presumption of law all in our favor, we suggest that if the court takes anything for granted, it should be the very reverse of what is involved in the proposition as stated. We deem this suggestion of importance, for the loss here assumed to have fallen upon the Bank has led to the idea, which seems to have taken a strong hold upon the mind of the court, that the equity of the case is against the plaintiff, and that to give effect to the obligations sued on would be merely shifting such loss from the shoulders of the plaintiffs to those of the defendants. Such a conclusion might perhaps be proper if any suspicion of fraud or connivance attached to the Bank in the transaction; but every suspicion of this kind has been disavowed, and the presumptions of law and of fact are with the plaintiffs and not against them. They surrendered the security of *Marchais*, as cashier, for his security as purchaser, and if any preponderance of equities is to be established as a guide to a decision of the case, we submit that the plaintiffs stand thus far upon ground as good, to say the least, as that of the defendants. There is no ground for the inference drawn by the court, that to render the defendants liable in this case would be an extension of their obligations beyond the contract in relation to which they bound themselves.

II. The court declare that the principal contract in this case was affected with a radical and absolute nullity: they find that there was no sale, no principal contract. The radical and absolute nullity here meant is the want of a thing sold.

UNION BANK
v.
BEATTY.

Before discussing the question of fact, we will premise, that if it be true that the sale was affected by a radical and absolute nullity, as asserted by the court, it produced no effect even against the principal debtor. And yet, as between the bank and *Marchais*, it will be found hard to say what element of the contract of sale was wanting. That there were parties and a price will be conceded. The things declared to have been sold were the house, the lot and the assets. The house existed and the lot existed, and so did also the assets; not under the denomination given by *Marchais*, which was a false one; for the outstanding debts of the original debtors to the branch had become, by the collection of them by *Marchais*, the debts of the cashier and his securities. But every false description given by him was the evidence of a debt due by the cashier and his securities to the branch; an asset of the branch which he himself bought, an outstanding debt due by them and as much constituting an asset as any other debt due to the branch. These *Marchais* acquired. Can not a man buy up claims against himself? Do they not form a legitimate object of the contract of sale? Are not sales of this kind of every day occurrence?

Let us take a familiar illustration. A planter comes to town and says to his factor, "Has my crop of cotton come to hand?" "How many bales are there?" "What is the market price?" "Have you sold any?" Factor replies, "I have received 300 bales, which I have on hand. I should like to buy the crop. I will give you ten cents round, say $40 a bale, making $12,000. I will give you my note for this sum, payable in ten days, with my neighbors *Stiles* and *Jones* as endorsers." "So be it," says the planter; the note is brought, endorsed by *Stiles* and *Jones*, which the planter takes, and goes home. The note is protested, factor has failed and turns out to have been a rogue, and had already, at the time of the purchase of the cotton, converted the greater part of it to his own use. Will it be contended that this sale was null, for the non-existence of the thing sold? That the vendee acquired nothing? He undoubtedly acquired the action in damages which the planter had against him, and which was a full equivalent for the supposed consideration, to wit: the cotton and which constituted the sale a complete and valid one between vendor and vendee. So in the case of the bank, the assets, as described by *Marchais*, were represented by an obligation which, to say the least of it, was an equivalent, to wit: the obligation of *Marchais* and his securities as cashier, *Marchais*' solvency being unquestioned until long after his departure from Louisiana, which was more than eighteen months after the date of the sale. Nay more, *non constat* that the obligation of *Marchais* and his securites as cashier was not more than an equivalent, that it was not better.

We submit then that there was a contract of sale, complete in all its parts; binding upon the vendee, not merely for the reason assigned in the separate opinion of one of the members of the court, because *Marchais* would be estopped from contesting its validity, by the rule of law which forbids the tribunals to listen to the man who alleges his own turpitude, but binding upon him *proprio vigore*, as a contract subsisting by itself, and clothed with every legal requisite to its existence.

III. There was error, says the court, both on the part of the bank and of the defendants as to the existence of the thing sold; and if the transaction is to be regarded in the light of a contract between the sureties and the bank, the error was on a point which was a principal cause of making the contract, and of course annuls it.

The main question then involved in his proposition is, whether, in the words of the court, the transaction *is* to be regarded in the light of a contract, between the *sureties* and the *bank* or not, and upon this head, we say, that if the "transaction" is a case of suretyship in the legal intendment of that contract, then clearly, under the code, and by the exposition of all the jurists, it is not to be regarded in the light of a *contract between the sureties and the bank;* that is, not in the light of a contract touching the thing sold, and thus not one of which the error can be predicated. And on the other hand, if the "transaction" is *not* suretyship, but is something more or something less, it must be, because, the parties from some agreements or stipulations not implied in the contract itself, have made a law for this particular case, and thus withdrawn it from the operation of the general principles that regulate the contract.

The court do not seem to contest the unilateral character of the contract of suretyship considered in its elements as established by the codes, and expounded by the jurists cited; nor the entire absence of all reciprocity of obligation on

the part of the creditor. From this elementary review as recognized by the court, it follows that the entire consideration given by the creditor passes to the principal debtor and not to the surety, and that the only reciprocal obligations which attach to the creditor are those in favor of the principal debtor, whence it would seem clearly to follow again—that it is only *through and in the right of the principal* that the surety can establish any relations with the creditor. Code Art. 3029. It is with the principal that the creditor stipulates for security, and the *only consideration* that the nature of the accessory obligation admi·s, passes between the *principal* and the *surety,* and that consideration is the service to be rendered to the principal. Suretyship is essentially, as well as by the classification of our code, and the code *Napoleon* and all the commentators, a *contrat de bienfaisance.* There is nothing pending between *creditor* and *surety* upon which their minds are required to meet and agree, or upon which consent· or the absence of it can be predicated; no subject matter of reciprocal obligations. The error or other vice, by which the promise of the surety is sought to be annulled must touch the legal consideration of that promise as between him and his friend the principal, or the surety is without relief; unless, as above stated, by means of defence derived *through and in the right of the principal.*

Such we conceive to be the legal effects that flow from the contract as created and defined by law. We therefore, say that the defendants, by simply becoming accessories to the obligations of *Marchais,* acquired no rights against the creditor, inasmuch as the law absolutely ignores, in the inception of the contract, any relations whatever between creditor and surety upon which error could be predicated.

But, say the court, admitting the correctness of these views of the nature of the contract under the law, has not the surety the right to prove that the creditor had himself made it bilateral and commutative. To this, we answer, unequivocally, yes. That is, the surety has the right to prove that his contract, which on its face was a contract of su·etyship, had become another and different contract by the agreement of the parties. But, we submit that such a change of the nature and essence of the contract from what it purports upon its face to be, must result from something very plain and stringent in the agreements of the parties, and that the new elements which they relied on to take it out of the category in which their common intendment, and even express declarations had placed it, must not be matter of assumption and inference, but must be patent and conclusive.

Upon the face of the instruments, in the present case, suretyship is the contract to be considered—suretyship as created and defined by law ; and if any elements foreign to its nature, and extending or restricting its effects, were introduced into the particular contract under consideration, we ask to be shown the clause or stipulation from which such modification or limitation may be held to flow, and in virtue of which these defendants are placed upon the footing of vendees of the bank, and the bank held to be bound to them in warranty.

The reasoning of the court admits that it is not by virtue of anything inherent in the contract of suretyship itself, but in virtue of something proved by the defendants extraneous to its essential character.

What, then, is the evidence upon which the court has found that the contract of suretyship in this case had been converted into a commutative contract, importing those reciprocal obligations by which the defendants are held entitled to consider themselves parties to the contract of sale between *Marchais* and the bank, and to set up error in the consideration of that contract ?

This question of fact, of such vital importance in the case, the court have resolved, not by any direct evidence, but by assumption of facts, which, if proved, would not, we with deference submit, justify the legal conclusions drawn from them.

Says the court: "The resolution of the Board of Directors, in which the defendants were specially named as the sureties they were willing to receive, *preceded* the execut on of the notes. The inference is irresistible that these resolutions were communicated to the defendants."

In the separate opinion of one of the members of the court, it is expressly admitted that there is no direct evidence of the communication of the resolution of the bank ; yet, says this member of the court, " from all the circumstances shown by the record, we are all convinced that the notes sued on were signed by the defendants with the understanding and intention that they were to be used in the purchase to be made by *Marchais,* and, therefore, the

transaction stands on the same footing as if the sale by the bank to *Marchais*, and the promise of the defendants as his sureties, were embodied in one instrument.

Now, without dwelling on the frail and unsatisfactory foundation of assumptions and inferences upon which the court rests the question of fact of the communication of the resolution ; the question, nevertheless, upon which the case is made to hinge by the court; what follows, even if we admit for the sake of the argument, that the defendants did sign the notes with the expectation that they were to be used in the purchase of valuable assets? Or, even if we admit the further proposition, that the transactions stands on the same footing as if the sale by the bank to *Marchais*, and the collateral undertaking of the defendants, had been embodied in one and the same instrument? Is the latter any the less a collateral and accessory promise distinct from the principal one? Any the less a unilateral contract wherein, as declared by the jurists, the creditor, as far as the security is concerned, binds himself to nothing? Are they any the less two contracts still, each resting upon its own separate and distinct censideration, and importing its own separate and distinct relations and effects? Clearly not. By simply embodying the two contracts in the same instrument, you do not blend and confound their distinctive elements and features ; they are two separate and distinct contracts still, and he who signed as surety is to be judged as surety, as surety under the law, for anything that appears to the contrary in the writings to which the parties consigned their agreements.

The utmost consequence that can be deduced, either from the assumed communication of the resolution, or the bringing the two contracts side by side into one and the same instrument, is, that both parties would be notified of the use that was to be made of the notes. Well, suppose we admit such notice. Is notice equivalent to privity of contract in the sense in which that language is used by the court? As a general rule such notice might undoubtedly be assumed in all such contracts; for the creditor must be supposed to know who the surety will be before he accepts him, and this implies a knowledge on his part that the surety becomes such for the performance of the principal contract. Does he therefore warrant the surety? From such knowledge can it be held that the inherent conditions of the contract have been set aside and new ones substituted, and that the creditor has thereby admitted the surety to participate in the principal contract, and assert the consideration of that principal contract to have been the consideration of his own collateral undertaking? If it be true to say, that all parties are to be held to have contracted in subordination to the law, and if it be right to exact that he who claims exemption from the general rule should place his right to such exemption beyond a doubt, we think it must be conceded that on the point under discussion, the premises of the court do not justify their conclusion, and that the particular contract under consideration is within the strictest limitations of that denomination of contracts by which the parties themselves have designated it.

It is in vain to urge that there was error in the motive determining the will of the defendants, and that they would not have bound themselves but for their belief in the existence of the assets, unless the belief be recognized by the law as the cause of the undertaking of the surety. The error, to produce any effects, must touch the *cause juridique* of the obligation. The distinction here suggested is most lucidly set forth by Marcadé in the extract from his remarkable Commentaries, cited at length in the original brief of the plaintiff, and we beg leave to urge it again upon the careful attention of the court, in the belief that it will serve to expose the fallacy of the objection under discussion. Marcadé, vol. 4, p. 347, v.

The motive or cause of the undertaking which the defendants put forward as the one determining their will, can not be considered as the true, the legal cause; that legal cause, the *cause juridique* of Marcadé, is the service to be rendered to the principal. As a matter of fact, it is doubtless true, that the defendants would not have bound themselves but for their belief in the existence of the assets. So in every case of suretyship ; no man in his senses would bind himself for another, but for his belief in the solvency of the latter, and his ability to protect his bondsman from loss; but whatever may have been the effect of this belief in determining the will, the law certainly does not recognize it as the juridical cause of his undertaking, and consequently, however great his error in that respect, it can have no effect in invalidating his

consent. The solvency of the principal, and the risks attending the collateral undertaking, fall into a class of those "*premiers motifs*" which, in the language of Marcadé, "*ne sont pas à considérer en droit.*" Those considerations are to be discussed between the principal and the surety. It is between them, and them only, that the law recognizes the relations out of which the whole contract of suretyship springs. The creditor has but one care, and that is to see that his own principal contract is valid and satisfactory to himself. He has but one set of relations, and they are all with the principal debtor. It is with him that he stipulates for the required security; but it is the principal who is to procure the security, and who obtains it, if obtained at all, for considerations moving entirely between him and the friend of whom he asks the service. For the creditor, it suffices that his hands be clean, and that the principal be bound, and the collateral liability of the surety follows as inseparable from it.

In concluding, then, upon this branch of the argument, we submit that the record presents for the consideration of the court, a case of simple and absolute suretyship devoid of any element which can lead to any other consequences than those which we have shown flow from the contract under the law. In addition to the foregoing exposition in which we have endeavored to reason out, in the light of legal principles only, the result to which we seek to lead the court, we respectfully submit that the doctrines which we have been combatting—and especially the idea of a warranty on the part of the creditor to the surety, strikes at the root of the contract in the common understanding of men.

To test it, let us recur to the illustration already used, the case of the factor who buys of the planter, his customer, the crop of cotton which factor had already received, and of which he had already converted to his own use the greater part. We had there supposed that factor had got time for the payment of the $12,000, which was the price of 300 bales of cotton that composed the crop, upon condition that he furnished his note for it, with *Stiles & Jones* as endorsers. Upon the non-payment of the note by factor, will it be pretended that *Stiles & Jones* could exonerate themselves as sureties upon the plea that planter warranted to them the existence of the thing sold, of which it afterwards appeared that factor had previously made a fraudulent conversion? Is this the law of such contracts in common usage and in the common understanding? And if there is any warranty at all, who is it, in point of fact, that warrants? Is it the planter, who, to the knowledge of *Stiles & Jones*, has not the thing sold in possession, or is it the factor who is known to have received it and declares that he has it.

So in the case of the Bank and *Marchais*, which party, in point of fact, warranted, if warranty there be. Can the defendants say that the Bank warranted when they knew that the thing sold was in the possession of *Marchais*? Can they say that they acted alone upon the representations of the Bank, when they knew that the entire mass of the assets had been created in the hands of *Marchais*, and was still entirely within his control and keeping?

The Court seems, as we have before remarked, to entertain the opinion that the equity of the case is strongly against the plaintiffs. The whole current of the opinion seems to be in that sense.

The plaintiffs knew the cashier principally by his written reports and communications, and had no other means of judging him. The intimacy of two of the defendants with *Marchais* is admitted. The others scarcely knew less of him. The former ate at the same table with him, and from the relations of all of them with him, in a small and retired country village, they had the means of well knowing his habits, his tastes, and his conduct. One of these defendants, viz: *H. M. Thibodaux*, was one of the directors of the Bank, and the last quarterly statement and report made by the cashier to the mother bank in November, 1849, when the negotiations for the purchase were made, and the names of the sureties were submitted, were signed by *Thibodaux*, as director, to testify their correctness; yet he is permitted to urge, in his defence, that the Bank was ignorant of what it ought to have known, and that it was the Bank that misled the defendants.

The Court seems to be apprehensive of danger of collusion between the creditor and debtor to the detriment of the surety, from the consequences of which the doctrine established in this case would shield sureties by making vendors warrantors. It is submitted that the law considers the danger as most probable

and imminent between the principal and surety, between whom the most intimate and confidential relations are presumed to exist, as the contract between them is one of beneficence. If the creditor is held to warrant, how easily could he be defrauded between the principal and surety. In the case of the planter and factor, put by way of illustration, the factor discloses his situation to his friends, *Jones & Stiles.* "I have sold one-half the cotton, which I must make good to my customer. Endorse my note; you run no risk. My simple planter warrants the existence of the cotton in my hands. He does not know I have sold it; his warranty will be falsified; *you bind yourself to nothing.* Endorse it, then; get me time, and I will make good my defalcation, or not, as I can. I shall get time, and can abscond if hard pressed." Is this the law?

In the present case, there is neither collusion between creditor and principal, nor between principal and surety, and it must be tested by the principles of the contract of suretyship, as established uniformly by all the jurists, and not by a supposed equity which has no place, but in subordination to these principles.

SPOFFORD, J. The arguments of counsel upon the re-hearing and further reflection have satisfied some members of the Court that, in the opinions formerly pronounced in this cause, too much weight was given to a presumption that the resolution of the Bank touching the sale to *Marchais* was notified to the sureties and constituted the inducement to their undertaking.

If the Bank had sought out the sureties and made representations to them for the purpose of persuading them to become accessory to the contract of *Marchais* the case would present the aspect under which it has already been considered. But, if mere presumptions are to influence our decision we might, perhaps, be authorized to go behind the resolution of the 1st Feb. 1850, and to infer that the first proposition in regard to the contract proceeded from the sureties to the Bank rather than from the Bank to the sureties; for the purchase was originally suggested by *Marchais* himself to the Bank, in his letter of the 23d Nov., 1849, in which he mentioned the names of all the defendants in this suit as persons who would endorse his notes to be given for the price. It can hardly be supposed that he would have named these gentlemen as endorsers, without having consulted them and procured their assent to his proposition. And, in that event, they must have been induced to become his sureties solely by their friendship for him and confidence in his statements, and not by any representation, or resolution, of the Union Bank. Moreover, the circumstance that these substantial men, neighbors and intimate acquaintances of *Marchais*, familiar with the condition and prospects of the Branch at Thibodaux, were ready to become his sureties for so large an amount, may have led the Bank into the sale, and thus enabled him to conceal his delinquencies when they might otherwise have been discovered, in season, perhaps, to save the Bank, by a recourse upon his official sureties.

Such a view of the facts would shift the equity of the case to the other side.

At any rate, it admonishes us of the danger of speculation upon what may have been the motives of the sureties, in the absence of proof of any communication between them and the Bank. Such proof being wanting, we have, upon mature consideration, concluded that the parties must stand upon their naked engagement.

The defendants have bound themselves *in solido* with *Marchais*, as sureties, on his promissory notes to the Union Bank, for value received.

This is their solemn written admission.

There is no shadow of evidence of any fraud on the part of the Bank.

Although the consideration of the notes, as between the Bank and *Marchais*, may be enquired into by the sureties, it is only for the purpose of ascertain-

ing whether there was a valid principal obligation to support the accessory promise, for, the surety may oppose to the creditor all the exceptions belonging to the principal debtor (not personal to him) which are inherent to the debt; but if the principal debtor is bound by the very contract to which the surety accedes, the surety, (saving the qualifications hereinafter stated) is likewise bound.

This flows as a consequence from the nature of suretyship.

"Le cautionnement est un contrat par lequel quelqu'un s'obligé pour un débiteur envers le créancier, à lui payer en tout ou en partie ce que le débiteur lui doit, en accédant à son obligation." Pothier's Obl., No. 366, Merlin's Rep. *verbo* caution. Suretyship is an accessory promise by which a person binds himself for another already bound, and agrees with the creditor to satisfy the obligation if the debtor does not. C. C. 3004, 3014. And, in a case like the present, where no communication has passed between the creditor and the surety, the remark of Troplong is certainly true; "le créancier ne s'engage à rien, et, des lors, le contrat est *unilatéral.*" Cautionnement, § 18, C. C. 1758.

It is only necessary that the contract between the debtor and creditor should be valid as between themselves to lay a sufficient foundation for the accessorial engagement of the surety; because the legal consideration or *cause juridique* of the latter contract is to be found in the service rendered to the principal by the surety acceding to his obligation at his instance, and thus giving him a credit he might not otherwise enjoy; and, if the principal contract be valid, the law looks only to this presumed beneficence of the surety as the cause of his obligation, and therefore holds him bound, no matter how unfounded may have been those interior motives of interest or confidence which really led to the act of beneficence. 4 *Marcadé*, 375.

*Marchais* bought the assets of the Thibodaux Branch, which had been under his management for many years; he bought, according to a schedule prepared by himself; the greater part of the assets thus described existed in kind and furnished a proper object of sale; some of them did not exist in the particular shape described by *Marchais;* but yet existed in claims of the same amount upon himself for undetected embezzlements; he was well aware, at the time of the sale, of the condition of these pretended claims upon other persons but real claims upon himself, and therefore, was effectually precluded from ever asserting their non-existence as a ground for not paying the price. We are thus driven to the conclusion that the principal contract was not, either wholly or in any part, affected with nullity, but it being a good and valid contract, the validity of the collateral undertaking follows. The recital in the notes that they were given for value received by *Marchais* having been shown to be true, the sureties are concluded.

Although the case has undergone elaborate investigation, no authorities have been cited from the civil law or from the jurisprudence of countries upon which the Civil law has stamped its impress, to sustain the position that a surety, in a case like the present, can plead an error in the principal obligation which the debtor himself cannot plead.

Nor, indeed, although some of the common law authorities seem to waiver as they approach this subject, have we been able to ascertain that any of them really justify such a position. In a neighboring State, the doctrine we deduce from the writings of the civilians as well as from the text of our Code, seems to have met the sanction of an eminent common law jurist. In the modern case

49

of *Dillingham* v. *Jenkins,* Mr. Chief Justice *Sharkey* observed: "It is insisted that *Jenkins* is a mere surety, and is not precluded by the declarations of *Montgomery* (the principal) from setting up failure of consideration. The consideration of a contract does not pass to the surety. His obligation arises from the consideration received by his principal. The contract of a surety is accessory to the contract of his principal, and if the principal be bound, the surety is also, unless he is discharged by some variation in the terms of the contract; but if there is no change in the risk he took upon himself, he is not discharged. The effect of *Montgomery's* admission was, that he had received a consideration, or, if he had not, he waived any objections on that score, and admitted the validity of the contract. The obligation of *Montgomery* was the inducement to the surety, and we cannot perceive how the surety can avail himself of a want of consideration when his principal cannot." *Dillingham* v. *Jenkins,* 7 Sm. & M. 486.

Upon the whole, we think that where no communication is shown to have taken place between the creditor and the surety, and no actual or constructive fraud is attributable to the creditor, and there has been no discharge subsequent to the contract, the liability of the principal is the test of the liability of the surety.

And, whilst we believe this rule to be in harmony with our law, we are also satisfied that it must contribute to the security of commerce as well as to the public confidence and repose.

But the defendants have once more urged upon our consideration the plea that they were released by the action of the Bank, in imposing upon *Marchais* an additional obligation not embraced in their resolution, to-wit: that of acting without compensation, as their agent in transacting any business they might have in the parishes of Assumption, Lafourche Interior and Terrebonne.

- It is sometimes said that sureties are the favorites of the law; an infelicitous phrase, for the law has no favorities. The meaning is that, as their contract is one of beneficence, sureties have a right to stand upon its very terms, and the least variation therein will absolve them. But the rule will not relieve the defendants; for their responsibility did not attach until the notes which they had signed as sureties in absolute and unqualified terms, had been delivered by *Marchais,* to whom they entrusted them, to the Bank in whose favor they were drawn; but *Marchais* had then already assumed the obligation which they say varied the terms of their contract. Their error springs from considering themselves as parties to the resolution of the Bank, the source of all the difficulty in the cause. As there is no evidence that this resolution was intended for, or was communicated to the sureties, it must, under the circumstances, be left out of view, except so far as it may affect the validity of the contract of *Marchais.*

The same remarks will apply to another branch of the defence, viz: the alleged neglect of the Bank to procure a certified statement of the assets, as called for by their resolution.

We think that the payments made by *Marchais* were imputed in accordance with the convention of the parties at the time the advance of ten thousand dollars was agreed upon, and as there is nothing to impeach this good faith of the Bank when the imputation was made, the defendants cannot now require these payments to be imputed differently.

It is therefore ordered that the decree heretofore rendered in this cause be annulled and set aside, and the judgment of the District Court reversed; and proceeding to render such judgment as should have been rendered, it is hereby ordered, adjudged and decreed that the plaintiffs do recover from the defendants *John C. Beatty, Louis Bush, James A. Scudday, Henry Michel Thibodaux* and *Leufroid Barras, in solido*, the sum of two thousand and thirty-three dollars twenty-two cents, with interest thereon at the rate of seven per cent. per annum, from the fourth December, 1851, till final payment; also the further sum of sixteen thousand dollars, with interest thereon at the rate of four per cent. per annum from the 1st March, 1850, to the 1st March, 1852, and at the rate of seven per cent. per annum from the 1st March, 1852, till final payment; with a credit in favor of the first of the above named defendants, *John C. Beatty*, in the sum of three thousand and seventy-five dollars, and interest thereon at the rate of seven per cent. per annum from the first of June, 1852; that on the issues made by the defendants for the return of their notes in the hands of the plaintiffs, other than the notes sued on, and for the cancellation of the signatures and extinguishment of the liability of the defendants thereon, there be judgment against defendants and in favor of the plaintiffs, confirming their title to all the said notes.

It is further ordered that the plaintiffs recover of the defendants *in solido* all costs in both courts.

Buchanan, J. I think the plaintiffs are entitled to recover, but for reasons somewhat different from those expressed in the opinion read by Mr. Justice Spofford.

This action is instituted upon promissory notes, joint and several in their form, signed by the defendants and one *Marchais*, and payable to the order of plaintiffs. The notes read: " We, *P. Marchais*, as principal, and *James A. Scudday, J. C. Beatty, L. Bush, H. M. Thibodaux* and *L. Barras*, as securities, promise to pay *in solido, for value received*, &c." By signing these notes, the defendants became debtors, *in solido* with *Marchais*, of the bank, and the effects of their engagement are governed by the rules applicable to other debtors *in solido*. Civil Code, Art. 3014. All defences which are competent to co-debtors *in solido*, are therefore competent to these defendants. A co-debtor *in solido*, who is sued by the creditor, may plead all the exceptions resulting from the nature of the obligation. Civil Code, Art. 2094. Now it is too well settled to admit of controversy, that the acknowledgment of value received in a promissory note, does not estop the maker from alleging and proving a want of consideration. That is precisely what the defendants have done here, and their plea appears to me entirely admissible, under the form of the engagement into which they have entered. On this point, I perhaps go farther than the doctrine of the opinion read by Mr. Justice Spofford.

I proceed to examine how far the defence of want of consideration, is sustained by the facts and the law. It is proven, that the $16,000 notes sued upon, were given in part payment of a sale to *Marchais* of numerous bonds and bills receivable, constituting the assets of the branch of the *Union Bank* at Thibodaux, according to an inventory made by *Marchais*, and verified by a committee of the Board of Directors of the branch bank. The plea avers this inventory to have been incorrect, through the fraud of *Marchais* and of the bank, the former of whom had embezzled and converted to his own use a portion of those assets, previous to the sale, they being intrusted to his charge as

Cashier of the bank; and the latter, well knowing of said embezzlement, yet concealed it from defendants. By means whereof defendants plead that the sale was void, and the notes for the price are without a consideration.

The charge of fraud against plaintiffs, being not only unsustained by proof, but abandoned in argument, needs no farther notice. The fraud of *Marchais* is sufficiently proved : and the position of the parties, at the moment of the sale of assets, and of the delivery of the notes for the price, may be thus defined : *Marchais* was supposed by the plaintiffs to have in his hands, for safe-keeping and for collection, as their Cashier, mortgaged bonds and discounted notes, belonging to the plaintiffs, to the amount of eighty thousand dollars and upwards ; but in truth, twenty odd thousand dollars in amount of said bonds and notes had been previously collected, appropriated or transferred by *Marchais*, and were not the property of the bank at the time of the sale. Under these circumstances, the bank sold to *Marchais* the whole of the assets supposed to be in his hands as their Cashier, at their par value, say eighty-three thousand dollars, of which nineteen thousand cash, and the remainder in four notes of sixteen thousand dollars each. Upon a deliberate review of the case in all its bearings, I am satisfied that the error under which the defendants, in common with the bank, labored, in relation to the existence of the full amount of bonds and notes embraced in the sale, is not an error which avoids the contract of defendants, either in whole or in part. It is undoubtedly true, that the existence of the thing sold is an essential of the contract of sale. But it is likewise a principle of our law, that, if the considerations expressed in the contract do not exist, yet the contract is valid, provided sufficient consideration can be shown. See the French text of the Article 1894 of the Louisiana Code, there being a misprint in the English text.

Now it is evident that if the assets in question did not exist in kind, *Marchais* was, at any rate, responsible to the Bank for their value ; and his responsibility was not merely the ordinary one, of an agent towards his principal, but the extraordinary one, of liability to a criminal prosecution and imprisonment at hard labor, under the Statute of 1821. (Bullard & Curry, p. 269.) The effect of the sale, then, was to give *Marchais* a legal title to that which he already possessed, not only illegally but feloniously ; or, at all events, to free him at once from a civil and from a criminal prosecution. Here we find a consideration abundantly sufficient for the contract of the defendants. Nor is this all. By the charter of the Union Bank, sections 14 and 36, (Acts of 1832, pages 56 and 68,) the Bank is required to exact security from their cashiers and other servants for the faithful discharge of their duties. We are bound to presume that such security had been given by *Marchais*. The effect of the sale, then, to *Marchais*, was to release himself, and consequently his official sureties, from the bond given by him and by them to the Bank. This, of itself, is a sufficient consideration for the notes in question.

The mention of *Marchais'* official bond suggests another view of the case, which affords, perhaps, the best solution of this vexed question of defendants' liability.

If defendants be released from their obligation towards plaintiff, it must be by reason of *Marchais'* official delinquency. Could plaintiff thereupon turn to *Marchais'* official sureties for indemnification ? And if not, why not ? It appears to me, that the first of these questions must be answered in the negative. The official sureties of *Marchais* might successfully argue that the condition of

their bond was fulfilled,—that they were only bound that *Marchais* should account for every thing that came into his hands as cashier; that he *had* so accounted; that the Bank had accepted his account, and had taken his notes, with five securities, for the balance which that account exhibited.

Here, after all, is the test. One of two innocent parties must suffer a loss; either the plaintiff or the defendants. Which of these parties has trusted *Marchais?* Unqestionably, the defendants. Had it not been for their act in guaranteeing the debt of *Marchais*—nay, more, in making it their own, by a solidary obligation, the Bank would have preserved a recourse which it has now lost. Again, had it not been for the act of defendants, the official sureties would have been interested in watching the movements of *Marchais*, and would not have suffered him to leave the country and remain absent many months, before any investigation of his affairs leading to the discovery of his frauds.

OGDEN, J., dissenting. Adhering to the opinion on the main point in this cause, which, as the organ of the Court, I delivered when our first judgment was rendered, I have some observations to add.

I think it is a mistake to say that the case was before considered by us under the aspect of the Bank having made representations to persuade the defendants to become accessory to *Marchais'* contract. In the opinion then delivered, the facts are fully and accurately stated as to the manner in which the negotiations were commenced and carried on between *Marchais* and the Bank, and from that statement I think it evident the case was viewed in its true and proper light. We had, then, no doubt that the Bank as well as the defendants understood that the real obligation which the defendants contracted was that of assuring to the Bank the payment of the price of certain assets which the Bank undertook to sell to *Marchais.* We then considered that as the notes which evidenced that obligation, and which are referred to in the act of sale, had not passed into the hands of third persons, we could properly inquire into all the circumstances under which they were given in the same manner as if the defendants, instead of signing notes as sureties of *Marchais*, had only signed the act of sale as sureties.

It has been stated in argument that there is no evidence of the resolution of the Bank having been communicated to the defendants prior to the execution of the notes by them; but surely it cannot be doubted that the transactions on their face render it morally certain that the notes were signed by the defendants and received by the Bank, in pursuance of the agreement on the part of *Marchais* to purchase and of the Bank to sell the assets.

The facts of the case have not been presented in any new light. If we had any doubt as to the defendants having been entirely ignorant of any misconduct on the part of *Marchais* when they consented to become his sureties in the purchase of the assets of the Bank, it would be our duty to remand the case for further evidence, because it was assumed in the argument and there is nothing to contradict it in the record, that such was the case. And yet it appears clear to my mind, that if by signing an obligation as *Marchais'* sureties for the purchase of the assets, they are to be rendered liable instead of *Marchais'* official sureties for the previous acts of embezzlement committed by him, such a result could only be arrived at by inferring their knowledge of these acts and willingness to aid him in this manner in preventing the discovery of them.

Viewing the defendants as innocent of any connivance or participation in the frauds of *Marchais*, the legal question presented in my mind does not admit of

any serious difficulty. Although *Marchais* himself is estopped from denying that there was any sale, the defendants are not. The error vitiates the contract as to the sureties. Error in a contract, when indued by the fraud of a third person, annuls it; (Tuillier on Obligations;) and more certainly must this effect be produced when the party to the contract, against whom this error is pleaded, by his own negligence or omission, enabled said third persons successfully to practice the fraud.

I do not see how the fact of the defendants consenting to become *Marchais'* sureties in the purchase of certain assets from the Bank, in any manner relieved the Bank from the obligation of inquiring into and being responsible for the truth of the representations of their own cashier as to what assets remained on hand. It has been said in argument that the Bank made no representations to the sureties. The act of sale itself states, without qualification, that they sell to *Marchais* the assets therein enumerated—the clause excluding the warranty can only have reference to the solvency of the debtors, as there must be a thing sold as well as a price to constitute a sale, he who sells a debt or incorporeal right necessarily warrants its existence at the time of the transfer; but the warranty of the solvency of the debtor is not implied. Civil Code, Arts. 2616, 2617.

The ground which has been taken, that *Marchais'* official sureties are released in consequence of the Bank having accepted the suretyship of the defendants for the amount of *Marchais'* purchase must depend for its correctness on the question whether the defendants, by agreeing to become the sureties for the price of a sale of specific assets which the Bank were to sell to *Marchais,* thereby incurred a responsibility for his previous acts. I think there is no principle on which such an extent could be given to the obligation, and that on that point this case cannot be distinguished from the case of *Fowor & Brum* v. *The United States,* 5th Peters' R., in which the Supreme Court of the United States held that the surety of a government defaulter could not be held responsible for a previous dereliction of the principal unless the bond was retrospective in its language. The great principles of equity are of universal application: *Sa dem lex Romæ et Athenis.*

I find nothing in the arguments which have been presented to controvert these views of the legality of the case, except what is derived from the new legal abstraction, that suretyship is a collateral contract. Toullier admonishes us that "This theory of reciprocal and unilateral contracts is an imperfect one, which will mislead if its application be not made with discernment. There is accuracy only in the division founded in the nature of things. The promise is unilateral when it is not yet accepted; it becomes bilateral by the acceptance." And even the textual provisions of our Code establish the existence of reciprocal obligations in contracts of suretyship, the creditor being bound at all times to hold himself in readiness to subrogate the surety who pays to all his rights unimpaired growing out of the contracts.

There is nothing peculiar in the principles of the civil law to distinguish it from the common law on this subject, and the same principles of equity ought to control under both systems. In the case of *Dillingham* v. *Jenkins,* the language used by Chief Justice *Sharkey* does not sustain the doctrine contended for by the appellants, but rather the reverse. He says: "if the principal is bound, the surety is also, unless he is discharged by some variation in the the terms of the contract; but if there is no change in the risk he took upon himself he is not discharged." In the present case, by the fraud of *Marchais,* and the error

on the part of the Bank induced by that fraud and their own neglect, the risk was changed entirely from what the parties contemplated it to be when the contract was entered into.

As to the extent to which the sureties should be relieved, my original impression was that the contract ought to be annulled only as to the assets which had no existence when the Bank undertook to make sale of them. I yielded that opinion to my colleagues who thought that if the sureties could avail themselves of the plea of error, it should have the effect of setting aside the sale *in toto*. I think there was error in that conclusion, and my opinion is, that the judgment before pronounced ought to be amended in that respect.

VOORHIES, J., concurring with OGDEN, J.