## EDWIN FISHER V. KRUTZ AND CAMPBELL.

1. EVIDENCE; *Agent's Admissions competent against Himself.* An admission by one that he is the agent of another, is good evidence of that fact as against the agent.

2. AGENCY; *When not Terminated.* Where by contract a citizen of this state became the agent of a citizen and resident of the state of Virginia, in 1857, and the agency continued, *held,* that the fact that the principal was a rebel, and within the confederate lines in 1863, did not of itself put an end to such agency.

3. AGENT; *Trustee.* An agent undertaking any business for another is disabled in equity from dealing in the matter of the agency upon his own account, or for his own benefit; and if he do so in his own name he will be considered as holding in trust for his principal.

*Error from Miami District Court.*

THIS action is here for the second time. It was heard and decided in this court at the January Term 1871, in connection with the case of "Krutz and Campbell v. *Alpheus* Fisher," and is reported in 8 Kas., pp. 90 to 98. (See note to that case, page 92.) A full statement of the facts will be there found on pp. 90, 91. The action below was brought by *Krutz and Campbell* to establish a trust, and to require *Fisher*, as trustee, to execute a conveyance to plaintiffs of certain lands in Miami county. *K. and C.* claimed as grantees of one Charles W. Statham; *Fisher* claimed under a tax deed issued upon a tax-sale certificate. At the time the lands were assessed and sold, and for several years thereafter, George Fisher, (the father of *Edwin,*) was the agent of Statham, and in August 1863 he took an assignment to himself of the tax certificate, with the avowed purpose of protecting himself for certain advances made by him as agent for Statham. In September of the same year George Fisher died. The tax deed was issued to the heirs of George Fisher in October 1865. After the decision reported in 8 Kas., *supra,* and on the filing of the mandate in the court below, *Fisher*, on leave, amended his answer. The material amendment so made is as follows:

"Defendant further shows to the court and alleges, that during the time stated and hereinbefore referred to, the said

Charles W. Statham kept and maintained his permanent home and residence in the state of Virginia, and was a resident within the lines of the confederate-states army; that at the time mentioned and referred to the people of the state of Virginia inhabiting the territory and locality where the said Statham then and there dwelt and made his home, were in insurrection against the United States, and at war with the same; and that he, the said Statham, and the inhabitants with whom he resided, did then and there adhere to, and aid, and acknowledge allegiance, to the so-called Confederate States of America, then waging war against the United States of America; and that he the said Statham, and the inhabitants of the said state of Virginia, in the locality and in the territory about the home and residence of the said Statham, were then and there, during all of said time, public enemies of the United States of America; that during all of said time, all business relations of every character whatever were prohibited between the citizens of the state of Kansas and citizens of said state of Virginia, and all intercourses of every kind and character between the citizens of said states were absolutely prohibited by law: Wherefore the defendant says the plaintiffs ought not to be permitted to have or maintain an action to enforce a pretended claim alleged to have been originated during a war between the parties and states in armed rebellion against each other."

The action was tried at the September Term 1871. Evidence was offered and admitted, over defendants' objection, of certain statements and admissions made by George Fisher at the time he purchased the tax certificate respecting his agency for Statham. The district court found generally for the plaintiffs, and made particular findings as follows:

"*Conclusions of Fact:* 1st, That George Fisher was the agent of said C. W. Statham before the commencement of the late rebellion between the so-called confederate government of Confederate States and the United States; 2d, That at the time the said George Fisher took the assignment of tax certificate of sale the said George Fisher was the agent of the said Statham; 3d, That the said Statham was a resident of the state of Virginia; and when the assignment of the tax certificate of sale was assigned to said George Fisher the said Statham was still a resident of the state of Virginia, and within the line of the confederate-states army, and the said

George Fisher was a resident and a citizen of Miami county, Kansas, and was at that time the legal agent of the said Statham.

"*Conclusion of Law:* That the tax certificate of sale assigned as aforesaid inures to the benefit of the said Statham, and to those claiming title under him."

Judgment was given in favor of the plaintiffs, and *Fisher* brings the case here on error for review.

*W. R. Wagstaff*, for plaintiff in error:

1. The question of agency is a matter of fact in issue in the trial of this cause. In the case of *Streeter v. Poor*, 4 Kas., 412, the court says, that neither the declarations of a man, nor his acts, can be given in evidence to prove that he is the agent of another. When agency is a question at issue, it should be proved by other testimony. To the same point see 11 Mich., 185; 21 Mo., 404; 6 Minn., 484; 1 Conn., 255; Cowen & Hill's notes to Phillips' Ev., 412; 1 Wis., 23. The declarations to be binding on a party as an agent must be a part of the *res gestæ*, and must have been cotemporaneous with, and made at the time of the transaction; 1 Greenl. Ev., § 103; 3 Conn., 250; Starkie's Ev., Sharswood's Notes, 85; 19 Conn., 205. The declarations of an agent made not in the course of his agency, but after the transaction to which they relate, in casual conversation with persons not parties to such transactions, are not binding on his principal. 3 Am. Law Register, 193; 32 Ind. Query: If not binding on principal, could it be binding on agent?

2. This man C. W. Statham, under whom defendants in error claim title, was a rebel from the beginning of the late civil war, to its close. The defendants in error have no better rights in the matter in controversy than Statham. In other words, Statham could convey no greater interest than he possessed at the date of his conveyance to the defendants in error. This war, in contemplation of law, and in fact, existed on the 16th day of August, 1861; 12 Stat. at Large, p. 1262. The war closed about August 20, 1866. 9 Wall., 56.

It is admitted in the petition that said Statham always was, and is a resident of the State of Virginia. The petition further states, that soon after the taxes for the year 1860 became due and payable, the said Statham, on account of his place of residence in the state of Virginia, was within the lines of the army of the Confederate States, and could not and did not have any other or further communication by letter or otherwise with the said George Fisher, deceased, in the lifetime of the said George; that the said George resided during all this time in the said county of Miami, in the state of Kansas, and died at his residence in said county sometime during the month of September, 1863. The evidence shows that Fisher sympathized with Statham in his condition, being surrounded by a state of war and feared that his property would be wrecked; that he said Statham was a resident of Old Virginia, spoke of the people of Virginia being in rebellion, and that he supposed that Statham was a rebel. The existence of actual war and being within the rebel lines, was the reason that Fisher assigned for Statham not sending him enough money to pay his taxes. There was at the time of this conversation, a state of actual war between the state of Virginia and the United States. Again, the testimony shows that Fisher spoke about war having broken out, and all communications between him and Statham had ceased; that Fisher said that the war was the reason that no communication was had from Statham. These facts prove Statham an alien enemy, owing a paramount allegiance to the Southern Confederacy, and his hostility was commensurate in point of time with his country's quarrel. 1 Kent's Com., 73, 74.

A state of war puts all the members of the two nations respectively in hostility to each other; and to suffer individuals to carry on a friendly or commercial intercourse, while the two governments were at war, would be placing the act of the government and the act of individuals in contradiction to each other. There cannot exist at the same time, a war for arms, and a peace for commerce. The war puts an end to all dealings, and all communications with each other, and

places every individual of the respective governments, as well as the governments themselves, in a state of war. It follows as a consequence of this relationship, that the subjects of the two governments are prohibited from communing or carrying on any correspondence or business whatever, and business relations subsisting between the two parties prior to the war are *dissolved by the mere force and act of the war itself.* 1 Kent Com., 66, 67, 68, 69. If Kent be good authority, Fisher could not be agent for Statham during the war. 8 Am. Law Reg., 334; 9 id., 516; 10 id., 196; 1 Woolworth C. C., 111, 121.

A contract made without any license or authority from the government, during the pendency of the rebellion, between a resident of a state in insurrection and a state which maintained a loyal adhesion to the Union, is void, both by the doctrines of international or public law applicable to the late civil conflict, and by force of express legislative declaration. And after the war has terminated, the defendant, in an action founded upon such a contract, may plead the illegality thereof as a defense. *Phillips v. Hatch,* 1 Dillon's Ct. Ct., 571; *Hanger v. Abbott,* 6 Wallace, 532. The payment of taxes for an alien enemy on lands in a loyal state, during the existence of the late rebellion, is unlawful intercourse, and prohibited under the act of Congress of July 13, 1861; *Phillips v. Hatch,* supra; 6 Wall., 521, 531; 8 Wall., 184.

The authorities cited establish the law to be, that contracts made between residents of belligerent states, during the late war, are void; that all commercial intercourse between citizens of belligerent states was prohibited; that all contracts concluded before the war were, during its existence, suspended. The facts in the case at bar, as shown by the records and proceedings, are, that on August 29th 1863 George Fisher paid the taxes on the land in controversy, for the years 1860, 1861, and 1862, amounting to $63.00, and took an assignment of the tax-sale certificate. The tax was a debt due to the state of Kansas, to Miami county, and to her organized townships and school districts. This debt was payable to the treasurer of Miami county, at his office in Paola, and no

other place. Statham, the owner of the land, was then, theretofore and thereafter, a resident of the state of Virginia, and within the lines of the confederate-states army, an alien enemy. It was unlawful for him to hold intercourse with the treasurer of Miami county, or any other resident of Kansas; it was unlawful for him to come in person into the state of Kansas, without a special permit; it was unlawful for him to make a contract with any person in Kansas, and he was absolutely prohibited from enforcing any contract concluded by him with any citizen of this state before the war began. A stream cannot rise higher than its source. An agent cannot rise higher in his calling than his principal. If Statham could not act for himself, by what process could he empower Fisher to act in his stead? If Statham figures as a party to this transaction, the taxes of 1861 and 1862 constitute a debt contracted by him during the war, and void. But it may be claimed that the taxes of 1860 was a debt contracted before the war; if so, it was suspended, and no rights could be acquired under it, or enforced, during the war. During the war, Statham, under the law, had no rights that a citizen of Kansas was bound to respect, and no obligations in a business point of view, could be created, that courts would be authorized to enforce. There could be no consideration passing from Statham to Fisher to create an obligation on Fisher's part. In fact, there was none; Fisher paid the taxes with his own money, not Statham's. The principal must furnish the money to his agent to buy land for him in order to make him his trustee; 34 Mo., 25. The state of Kansas had the right to tax this land, and had the right to receive the taxes, and to assign the certificate of sale, and to convey the land by tax deed. A citizen of Kansas had the right to pay the taxes, to receive the assignment of the tax-sale certificate, and to receive a deed for the land in his own right. This is what was done, and it is admitted it was lawfully done. Then Fisher and his representatives became the lawful owners of the land. The tax deed to the heirs of Fisher is valid, and creates in them the superior or paramount title.

*B. F. Simpson,* for defendants in error:

1. It is conceded that it is a general principle of law, that war operates as an interdiction of all commercial and pacific intercourse and communication with the public enemy, and it follows as a corollary from this principle, that every species of private contract, made with the subject of an enemy during war, is unlawful. Wheaton's Elements, 586; 1 Kent, 67, 68; 16 Johns., 483; Halleck's Int. Law, 356; 2 Black, 635. This is the principle relied upon to prevent a recovery in this case; but this principle has no application to the facts in the case. The relation of principal and agent existing between Statham and Fisher was not constituted during the war. The evidence shows that it was created before the war. Fisher took a tax-certificate of sale on the land of Statham in August 1863. At that time Fisher had in his hands, as the agent of Statham, money that he ought to have applied in the payment of these taxes, by virtue of his contract of agency, and his duties as agent, made before, and not during the war. The creation of the relation of principal and agent between Statham and Fisher, by contract, was lawful at the time it was so created. Vattel says that the property held by the enemy's subjects within the belligerent state, is not liable to confiscation *jure belli.* He says, " the rents and profits may be, in order to prevent them from being remitted to the enemy." And this declaration of Vattel is approved and elaborated by Wheaton, 2d annotated ed., 529. I collect from all that I have been able to find upon this subject, this rule as the true one: That the act, existence or declaration of war, of its own force, does not have the effect to confiscate the real estate of the enemy's subject, situate within our lines or state, but that it simply confers the right to confiscate. And in pursuance of this view, Congress, by an act approved July 17th, 1862, authorized confiscation, and prescribed the manner in which it should be done. But no attempt was made to confiscate the property of Statham. Hence, during the war this land was and remained the property of Statham,

the same as before the war. His right to exercise acts of ownership over it was not destroyed, but only suspended during the existence of the war. When the war ceased, all his rights in and to this land, (and I mean *rights*, as contra-distinguished from *title*,) the exercise and enjoyment of which had been held in abeyance by the war, were resumed. If a tenant had been indebted to him for rent, at the time of the commencement of the war, and the rent or indebtedness of the tenant had not been confiscated, he could have brought his action and have recovered it after the close of the war; and the statutes of limitation would have ceased to operate against him during the existence of the war. See generally on this subject, 3 Am. L. Reg., N. S., 361; 1 Peters C. C., 524; 3 Wash. C. C., 396; 16 Johns., 438; 7 Am. L. Reg., N. S., 606; 43 N. Y., 164.

2. Another question is presented — that there was not sufficient evidence to establish the fact of agency. The decla-rations and admissions of Fisher are not only competent and satisfactory, but are the best evidence that can be produced under the circumstances. Fisher is dead; Statham is incom-petent. The fact of agency is in issue between the grantees of Statham and the heirs of Fisher; and Fisher's declarations and admissions that he was the agent of Statham, are primary, and sufficient to establish that relation.

The opinion of the court was delivered by

KINGMAN, C. J.: The facts found by the court seem to be sustained by the evidence. It is true that the evidence that George Fisher was the agent of Statham, is not conclusive, but it is unimpeached and uncontradicted; and one cannot read it without coming to the conclusion that he was such agent, when he took the tax certificate. Witnesses do not always make those nice and refined distinctions in the terms they use, that characterize writers upon mental science, and seem to be so familiar to counsel. Still they have made their meaning sufficiently intelligible in this case for a plain man to understand it. An admission by one that he is the agent

of another is good evidence of that fact as against the agent, and that is the purpose for which it was admitted in this case. Different rules apply, where it is attempted to use the admissions of a person to prove that he is an agent, as against a third party, as in the case of *Streeter v. Poor*, 4 Kas., 412.

A much more important question remains for decision. The plaintiff in error holds the tax deed as the heir of his father, George Fisher, deceased. George Fisher became the agent of Statham, the holder of the original title, and under whom the defendants in error claim, in the year 1857, and this agency continued till he became the holder of the tax certificate, unless that relation was destroyed by the war of the rebellion. It is clear that in 1863 Fisher thought and talked as though he was still the agent of Statham. When this case was here before, this court decided that an agent, while acting as such, cannot become the owner of the tax title as against his principal. The plaintiff in error now seeks to avoid that conclusion by alleging that the contract of agency was destroyed by the condition of the parties in 1863. It appears from the evidence that Statham in 1861 was in the state of Virginia, and within the confederate lines, and so remained until Fisher had become the holder of the tax-sale certificate; and that during all that time communication between Statham and Fisher was cut off by the war. It is also asserted that Statham was a rebel, but the evidence is not sufficient to make that inference certain. Nor do we consider the fact material in this case. If he was a rebel, the government might have confiscated his land; and as a rebel he could not lawfully exercise acts of ownership over his land. But his right to do so was not destroyed; it was only suspended. Did this state of facts destroy the agency so as to absolve Fisher from all legal obligations to Statham? We think not. He had Statham's money in his hands. The government could have confiscated it. During the war the agent could not have paid it over, not because he did not owe it, but because he could not have done so without holding intercourse with the enemy within the confederate lines,

which of itself would have been illegal. And perhaps also, because he could not transfer funds, which might become a source of revenue to the government, to those who might use it to strengthen the hands of the common enemy. But while for one or both of these reasons he could not have paid the money he had, over to Statham, the debt was not discharged— only the collection suspended. When the war ceased, the payment could be enforced. A state of war puts an end to all such business relations, between the citizens of the opposing powers, as requires a correspondence between them; and all contracts made with a view to any communications between parties, members of nations at war, are void as against public policy; "but other contracts existing prior to the war are not extinguished, but the remedy only is suspended, and this only from the inability of an alien enemy to sue, or to sustain, in the language of the civilians, a *persona standi in judicio*." 1 Kent's Com., 68. It is not necessary in this case to examine at length the rights of citizens in time of war, because the principle involved does not require it. A man may retain an agency for an alien enemy during war, because by so doing he does not necessarily violate the rule inhibiting communication. This is not only according to principle, but is in conformity with the decided cases. *Denniston v. Jarbric*, 3 Wash. C. C., 396; *Buchanan v. Curry*, 19 Johns., 136; *Manhattan Life Ins. Co. v. Warwick*, 20 Grattan, 614; *Conn v. Penn*, 1 Peters C. C., 496; *Monseax v. Urquhart*, 19 Louisiana, 485. In a recent case in the supreme court the principle that an alien enemy may have an agent residing in this country and thereby enable a debtor to pay his debt to the agent, and thus stop the payment of interest, was recognized; *Ward v. Smith*, 7 Wallace, 447. There was therefore no reason growing out of the war why Fisher should not remain the agent of Statham. He really did continue as such agent; and retaining the agency he could not become the holder of the tax title as against the principal, as was before decided in this case. We have not thought it necessary to consider whether the law

applicable to alien enemies, belonging to different countries, is applicable to citizens of states in rebellion, and citizens of states supporting the government, and are not to be precluded from an examination of that question when it shall arise. The most favorable view of the case for the plaintiff in error is the one we have presented. The judgment is affirmed.

All the Justices concurring.