WILLIAM H. BARTLETT *et al.*

*v.*

ELEANOR WHEELER.

*Opinion filed February 21, 1902—Rehearing denied April 4, 1902.*

1. BONDS—*if bond refers to contract, both instruments must be taken together.*   If a bond is attached to a contract and refers thereto to indicate the liability assumed, the contract becomes a part of the guaranty, and both instruments are to be taken together in order to ascertain the agreement of the parties.

2. SAME—*surety not liable for previous defaults unless contract is retrospective in terms.*   A surety on a bond given to secure the faithful performance of a contract is not liable for defaults of his principal previous to the transaction wherein the bond and contract were executed, unless the contract is retrospective in terms.

*Bartlett* v. *Wheeler*, 96 Ill. App. 342, affirmed.

APPEAL from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Livingston county; the Hon. G. W. PATTON, Judge, presiding.

This is an action of debt begun on April 4, 1900, by the appellants against the appellee as surety upon the following bond, to-wit:

"*Know all men by these presents,* That Eleanor Wheeler, post-office address Long Point, of the county of Livingston and State of Illinois, is held and firmly bound unto William H. Bartlett, Frank P. Frazier, Homer H. Peters and Herbert E. Rycroft, of Chicago, Illinois, co-partners trading as Bartlett, Frazier & Co., in the sum of two thousand ($2000) dollars, good and lawful money of the United States of America, to be paid to the said Bartlett, Frazier & Co., or to their certain attorneys, executors, administrators or assigns, for which payment, well and truly to be made, I bind myself and my heirs, executors and administrators, jointly and severally, firmly by these presents.

"Sealed with my seal and dated this first day of May, in the year of our Lord one thousand eight hundred and ninety-nine.

"The condition of this obligation is such, that if the within named T. H. Wheeler shall well and truly do and perform his agreements and covenants, and each and all of them, as set forth in the *within* contract, and in all and every respect comply therewith, and on the termination thereof, by limitation or otherwise, shall fully pay the said Bartlett, Frazier & Co. the money which may be due them, their executors, administrators or assigns, then this obligation to be void; otherwise to remain in full force and virtue.       ELEANOR X WHEELER.   [Seal.]
                                              her
                                              mark

"Sealed and delivered in the presence of CHAS. F. ALLEN, W. E. INGLIS."

The contract referred to in the bond is as follows, to-wit:

"This agreement, made this first day of May, 1899, between Bartlett, Frazier & Co., of Chicago, party of the first part, and T. H. Wheeler, grain buyer at Leeds, in the county of LaSalle, State of Illinois, party of the second part:

"*Witnesseth:* That the party of the first part, for and in consideration of the agreements hereinafter set forth, to be kept and maintained by the party of the second part, agrees to advance and loan to said party of the second part such sums of money as said party of the

second part shall from time to time need, for the purpose of assisting or enabling him to purchase and pay for ear and shelled corn, wheat, oats and other grain, at the station of Leeds, Illinois, upon the terms and conditions following:

"*First*—The party of the second part agrees that in purchasing grain at such station he will purchase the same at the lowest possible price, and that he will at no time pay a higher or greater price therefor than shall be expressed and limited in the last advice by letter, telegram or telephone which he shall have received from said party of the first part.

"*Second*—The party of the second part agrees that he will sell and deliver to the party of the first part all the grain which he shall so purchase, at an advance over and above the purchase price thereof of one cent per bushel, and that he will not buy, sell, weigh or handle to or for any other party or firm during the existence of this contract. And said party of the first part agrees to purchase and receive all such grain at such advance per bushel, and to allow the proceeds thereof as a credit upon loans and advances made as aforesaid, and if nothing shall be due thereon, to pay for the same in cash.

"*Third*—The said party of the second part shall each day make detailed and itemized reports of all grain by him purchased, the price and prices paid therefor, and the place of delivery; and if any grain shall be contracted to be delivered in the future, the report shall state such fact, the names of the parties from whom purchased, the amount so purchased, the contract price thereof and the time of delivery. If any of the purchases shall be reported by telegraph or telephone, they shall be confirmed by mail the same day.

"*Fourth*—All ear corn shall be delivered in cribs, to be furnished by said party of the first part, or on board cars, as they may direct. The shelled corn, wheat, oats and other small grain shall be delivered as directed by

the party of the first part, either into warehouse, elevator or on board cars at said station, billed and consigned as directed. And the said party of the second part agrees to be ready, at all times, to deliver on board cars for said party of the first part, when called upon, the same quantity and quality of grain, of the respective kinds, that his reports and credits show he has received, contracted for and been paid for, said quantity to be determined by public elevator or actual railroad weights, and when such grain shall be shipped to interior points, he will guarantee weights to hold out at the place of ultimate delivery, within one per cent on each car of shipper's weight.

"*Fifth*—The party of the first part agrees to pay the necessary extra outlay of shelling and loading ear corn on car, but the party of the second part shall oversee such shelling and loading on cars without extra charge; and all small grain shall be weighed and delivered on cars for said party of the first part by said party of the second part without extra charge.

"*Sixth*—It is hereby understood and agreed between the parties that all grain purchased and delivered, as aforesaid, or which shall have been reported by said party of the second part as having been purchased and delivered or contracted for and not delivered, the proceeds of which, at the advanced prices, as aforesaid, shall have been credited to the said party of the second part, shall belong to and be the property of the said party of the first part and subject at all times to their order. No such grain or ear corn shall be taken or withdrawn from storage or cribs for any purpose, except to load on cars under the directions of said party of the first part.

"*Seventh*—It is further understood and agreed that said party of the second part shall, by virtue hereof, have no authority to buy or sell or contract for the purchase or sale of any grain in the name or on account of the party of the first part, and that no agency is hereby created for

the purchase or sale of grain, or for any other purpose whatever, save for the storing, oversight and shipment of grain as hereinbefore provided. The party of the second part agrees to furnish elevator of ten M. bushels capacity, free of expense to party of the first part. The party of the first part agrees to allow the party of the second part one-half cent per bushel for stored oats and one cent per bushel for ear corn as storage for grain carried outside of elevator. The party of the first part agrees to allow the party of the second part one per cent shrinkage on stored oats carried longer than April 1, 1900, and three per cent on ear corn carried longer than May 1, 1900. If, however, ear corn overruns, overrun shall belong to party of the first part.

"This contract may be canceled by either party by giving sixty days' notice.

"This agreement shall be and remain in force from the first day of May, 1899, until the first day of May, 1900."

The contract was written upon a separate piece of paper, but pasted upon the back of the bond. The breaches declared on were, that T. H. Wheeler failed or refused to account to appellants, as required by the terms of the contract. The declaration contains the following averment: "And the said plaintiffs say that under the said agreement they, the said plaintiffs, did advance and loan to the said T. H. Wheeler such sums of money as said Wheeler from time to time needed for the purpose of assisting or enabling him to purchase and pay for ear and shelled corn, wheat, oats and other grain at the station of Leeds, Illinois. But the plaintiffs say that the said T. H. Wheeler, disregarding his obligation, failed to account to the said plaintiffs for the corn, oats, wheat and other grain by him purchased for the plaintiffs, or for the purchase of which he received money from the plaintiffs, and failed to account to the said plaintiffs for money received by him in large amounts from the plaintiffs to be used by him in and about the purchase of grain;

195—29

by reason of which breaches the said writing obligatory became forfeited and thereby an action had accrued to the said plaintiffs to demand and have of the said defendant the said sum of $2000.00."

Various pleas were filed by defendant, among which were the pleas of *nil debet* and *non est factum.* Upon the trial of the case before the court and a jury, the bond and contract were introduced in evidence, and the execution of them was proven. But the trial court excluded the testimony offered by the appellants upon the breach of the contract, and instructed the jury in writing to find the issues for the defendant, whereupon the jury returned their verdict into court finding the issues joined in favor of the defendant below, the appellee here. After motion for new trial was overruled, judgment was given upon the verdict. An appeal was taken to the Appellate Court where the judgment of the circuit court was affirmed. The present appeal is prosecuted from such judgment of affirmance.

A. C. BALL, and GEORGE P. MERRICK, for appellants.

REEVES & BOYS, for appellee.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

Appellee, Eleanor Wheeler, was surety upon the bond, upon which this suit is brought. The condition of the bond was that, if T. H. Wheeler should perform his agreements and covenants as set forth "in the within contract," and in every respect comply therewith, and, on the termination thereof by limitation or otherwise, should fully pay Bartlett, Frazier & Co. the money, which might be due them, their executors, etc., then the obligation was to be void. In order to determine what the agreements and covenants were, which T. H. Wheeler was to do and perform, it is necessary to refer to the contract, referred to in the bond and pasted upon the back of it.

"Where a guaranty is appended to a contract and makes reference thereto to indicate the liability assumed, the contract becomes a part of the guaranty." (2 Story on Contracts,—4th ed.—sec. 866). Both instruments are to be taken together in order to ascertain the agreement of the parties; but, while the guarantor will be bound to the full extent of the terms of his agreement, a contract of guaranty will never be construed, so as to embrace anything which is not included within the fair scope of the terms of the agreement. (Ibid).

As a general rule, "sureties are only liable for the defaults of their principal during the term, for which their bond was given, and after it was given, unless it is retrospective in terms." (2 Sutherland on Damages,—2d ed.— sec. 480, and cases referred to in note 1). It is said in Brandt on Suretyship and Guaranty, (2d ed. vol. 2, sec. 526): "As a general rule, the bond of a public officer has no retroactive effect, and does not cover past delinquencies, unless it in terms says that it is to have such effect."

In *County of Mahaska* v. *Ingalls*, 16 Iowa, 85, the Supreme Court of Iowa, speaking through Mr. Justice Dillon said: "The bond was not retrospective in its terms. Consequently, while the sureties would be bound for the public moneys in the hands of their principal at the time of the execution of the bond in suit, although a previous bond then existed with different sureties, and also for money subsequently coming into his hands, yet they would not be bound for his past derelictions of duty or misconduct." (See also *Farrer* v. *United States*, 5 Pet. 373; *United States* v. *Linn*, 1 How. 104; *Anaheim Union Water Co.* v. *Parker*, 101 Cal. 488; *Independent School District* v. *McDonald*, 39 Iowa, 567; *Thompson* v. *Dickerson*, 22 id. 362; *State* v. *Paul's Exr.* 21 Mo. 56; *State* v. *Polk*, 14 Lea, 7).

In the case of *Hyatt* v. *Grover & Baker Sewing Machine Co.* 41 Mich. 225, where the appellee brought suit against appellant on a bond, given him for the good conduct of one Tuttle as agent of the company, the court said: "The

question turns on the construction of the obligation, and it must be held to speak from the time it took effect. No other view is admissible now. It is not to be assumed that the surety intended to become responsible for acts or delinquencies accomplished before he bound himself. * * * On the other hand, it is just to suppose that, if the parties had understood that past transactions were to be covered, the bond would have been made retrospective in its language. * * * Such, however, is not the case. The terms are all future. The language imports an undertaking relative to posterior transactions only, and it cannot be applied to antecedent ones without violating its natural sense. We are, therefore, of opinion that the court erred in applying the bond to matters which arose before it was given." (See also *United States* v. *Boyd*, 15 Pet. 187).

The same doctrine has been announced by this court in the case of *Stern* v. *People*, 96 Ill. 475, where it was said (p. 479): "If the defaulting officer misappropriated funds that came to him in his official capacity during a term of office when defendants were not his sureties, they were under no legal obligation to make good such defalcation. That obligation rested upon his sureties on his bond for the term in which the misappropriation occurred. It is but stating a truism to say, if the funds were misappropriated during a former term, it was not possible for him to deliver them to his successor. The fact such officer was his own successor can make no difference."

In the case at bar, it appeared from the evidence that T. H. Wheeler, named in the bond and contract, had been the agent of the appellants for the purchase of grain from May, 1896, down to May 1, 1899, when the present contract was executed. It does not appear, however, that any written contract existed between the appellants and T. H. Wheeler prior to May 1, 1899, or that any bond, such as is here sued upon, had been executed prior to that time.

Upon the trial below, appellants offered proof for the purpose of showing that T. H. Wheeler was chargeable with a defalcation or shortage, which had occurred in the dealings between him and appellants prior to the date of the bond and contract here sued upon. The trial court ruled, that plaintiffs below might show a failure to deliver any grain purchased with funds furnished by them to T. H. Wheeler subsequent to the execution of the written contract of May 1, 1899, but refused to permit them to prove grain in his hands which had not been turned over, purchased with funds furnished to him prior to May 1, 1899. In other words, the ruling of the trial court was, in substance, that the appellants might not show any grain on hand by the books and receipts other than grain purchased and received within the period of the contract of May 1, 1899. The correctness of the ruling of the court in excluding the offered testimony depends upon the construction of the contract, and whether it is retrospective or prospective in its terms. If the terms of the contract show, that it was not to have a retrospective operation, then the ruling of the court was correct.

After a careful examination of the contract we are of the opinion that it refers to future transactions only. By the first paragraph of the contract, appellants agree to advance and loan to T. H. Wheeler such sums of money as he shall from time to time need for the purpose of assisting or enabling him to purchase and pay for corn, wheat, etc. This language, as well as all the other language of the contract, imports future action of the parties, and has no reference to past transactions. The clause of the contract, chiefly relied upon by the appellants, is the fourth clause which contains these words: "And the said party of the second part (T. H. Wheeler) agrees to be ready at all times to deliver on board cars for said party of the first part, when called upon, the same quantity and quality of grain of the respective kinds that his reports and credits show he has received,

contracted for and been paid for, said quantity to be determined by public elevator or actual railroad weights; and when such grain shall be shipped to interior points, he will guarantee weights to hold out at the place of ultimate delivery, within one per cent on each car of shipper's weight." It is claimed by the appellants, that this language of the contract imports an intention to make T. H. Wheeler chargeable with appellants' grain, or with the price thereof, whenever he should be called upon to deliver the same without any reference to whether or not he bought the grain within the time of the contract, or when he bought it, or when the money was furnished him for the purpose of buying. We are unable to agree with this contention. The third clause of the contract provides that T. H. Wheeler "shall each day, make detailed and itemized reports of all grain by him purchased, the price and prices paid therefor, and the place of delivery; and, if any grain shall be contracted to be delivered in the future, the report shall state such fact, the names of the parties from whom purchased, the amount so purchased, the contract price thereof and the time of delivery." By the second clause of the contract appellants agree "to purchase and receive all such grain at such advance per bushel, and to allow the proceeds thereof as a credit upon loans and advances made as aforesaid, and if nothing shall be due thereon, to pay for same in cash." The reports and credits, mentioned in clause 4 of the contract, refer back to the credits and reports spoken of in the second and third clauses of the contract. The credits and reports named in the second and third sections or clauses of the contract are such credits and reports as are to be allowed and made after the date of the contract. The contract, being clearly prospective in its terms and not intended to be retrospective in its operation, the ruling of the court in excluding the offered testimony was correct.

The appellants did not offer to prove by the books of account of Wheeler and plaintiffs, that there was a shortage, but to show by the auditor of appellants that, from an examination of the books of account of Wheeler made by him, there appeared to be a shortage. Whether the books of account were competent or not, they were the best evidence, and the conclusion of the auditor from an examination of them was not, certainly, competent. It was not shown that the original reports of Wheeler and the credits allowed him were lost, or that they could not be produced. The offer was to show from an examination of the books of account of Wheeler and the plaintiffs, not that he actually had on hand, but that he ought to have had on hand, a certain number of bushels of corn in May, 1899.

Appellants rely upon the case of *Roper* v. *Sangamon Lodge No. 6*, 91 Ill. 518, and other cases following it, for the purpose of showing the incorrectness of the views above expressed. If Wheeler had made a report to the appellants on May 1, 1899, showing that he had a certain amount of grain on hand, and the appellants on the trial below had offered to prove that fact by competent evidence, then, under the rule announced in *Roper* v. *Sangamon Lodge No. 6, supra*, appellee would have been bound by that report whether the grain was actually on hand or not. But appellants did not offer to show that any such report was made by Wheeler to the appellants.

In *Stern* v. *People, supra*, the case of *Morley* v. *Town of Metamora*, 78 Ill. 394, is distinguished from cases like the one at bar.

For the reasons above stated, the circuit court committed no error, and the judgment of the Appellate Court, affirming the judgment of the circuit court, is affirmed.

*Judgment affirmed.*