## MAPES v. FOSTER, ET AL.

(No. 1433; April 10, 1928; 266 Pac. 109)

*Curran & Cobb,* for plaintiff in error.

*W. E. Clark,* and *D. W. Ogilbee,* for defendant in error, Southern Surety Company.

RINER, Justice.

H. Mapes brought suit in the District Court of Natrona County against Edwin B. Foster and Southern Surety Company to recover upon a bond given by Foster as real estate agent, under the provisions of Chapter 31, Laws of 1921. Judgment was entered against Foster in favor of Mapes, but against Mapes and in favor of Southern Surety Company. From this judgment, the cause is brought to this court by proceedings in error for review. The parties will be referred to hereinafter either as plaintiff and defendants, or by their respective names.

The first three paragraphs of plaintiff's petition allege, in substance, the plaintiff's residence in Casper, as a citizen of the state; that the defendant Foster was also a citizen of Wyoming, residing in that city, and engaged in the general business of real estate "with the right to conduct and transact such business in the state of Wyoming as provided in Section 1, Chapter 31 of the 1921 Session Laws of Wyoming, and that he has been so engaged at all the dates and times hereinafter mentioned;" that the defendant Southern Surety Company is a corporation organized and existing

248

under the laws of the State of Iowa, authorized to transact business in Wyoming. It is then alleged that on or about August 28, 1923, plaintiff purchased through defendant Foster, "then acting for and in behalf of parties unknown to this plaintiff," certain described real property, paying therefor the sum of $580; that Foster failed and neglected to put plaintiff in possession of this property or to deliver title thereof—the said title "to be delivered by the relinquishment of certain homestead rights;" that said relinquishment could not be obtained for the reason that neither the defendant Foster nor the party through whom he had or claimed agency had any right or interest in the same; that the said property had been homesteaded by one Allison Pinney, then deceased, and thereafter re-entered by his widow, Emma Pinney; that demand both of possession and title, and also of the funds entrusted to him, was made on Foster by plaintiff, but plaintiff has received nothing. The sixth paragraph of the petition sets out that pursuant to Chapter 31 of the Session Laws of Wyoming 1921, defendant Foster gave a bond and procured renewals thereof, executed by himself, as principal, and the defendant, Southern Surety Company, as surety, in the sum of $1,000, guaranteeing the faithful accounting for all funds entrusted to him. The bond and renewals are set out verbatim. Omitting the penal clause and that providing for yearly renewals, said bond reads:

"THE CONDITION OF THIS BOND IS SUCH That Whereas, the above bounden Principal *Edwin B. Foster* has applied to THE STATE IMMIGRATION COMMISSIONER OF THE STATE OF WYOMING, for a license authorizing him to engage in the business of a Real Estate Agent for the period ending December 31, 1921, and is required by law to file a bond to the State of Wyoming, for the use and benefit of all persons, who may be damaged by the wrongful conversion of any trust funds held by such Real Estate Agent;
"NOW, THEREFORE, the Condition of this obligation is such, that if the aforesaid *Edwin B. Foster* shall well and truly and faithfully account for all funds entrusted to him

in his capacity as Real Estate Agent from this date up to and including December 31, 1921, then this obligation to be void, otherwise to remain in full force and effect.''

The seventh paragraph of the petition alleges ''that plaintiff entrusted with the defendant, Edwin B. Foster, on the 28th day of August, 1923, the sum of $580, for the sale and purchase of said homestead relinquishment of the real property herein described, and that the said Edwin B. Foster wrongfully converted said sum to his own use.'' Judgment is asked in the prayer of the pleading for $580, with interest and costs.

The defendant Foster filed a separate answer in which he admitted the allegations of the first three paragraphs of plaintiff's petition, and denied, generally, all other allegations in that pleading. The separate answer of the defendant Southern Surety Company also admitted the allegations of the first three paragraphs above mentioned, averring in connection therewith that Foster was not, at the time of filing the answer, residing in Wyoming. It admits, too, the allegations contained in the sixth paragraph of the petition. Disclaiming any information concerning the conversion of the money entrusted to Foster, the Southern Surety Company pleads as a defense ''that the defendant Edwin B. Foster, in and about the transaction complained of in the petition herein, was acting for and on behalf of himself alone, and that the plaintiff at all of the times complained of, had full knowledge of the fact that the defendant Foster was so acting;'' that the relinquishment contracted by the plaintiff to be purchased from the defendant Foster, was to be the relinquishment of said Foster in and to the real property described in the petition. The answer also admits that plaintiff paid Foster the sum of $580, on or about the date alleged, but ''avers that the same was paid on account of the relinquishment contracted to be purchased from the defendant Foster, personally, and not as the agent or representative of any other person.'' Then follows a paragraph which sets out a general demurrer to the peti-

tion. To this answer of the Surety Company a reply was filed on behalf of the plaintiff, in form a general denial of all the new matter appearing therein. The court below overruled the demurrer above mentioned, and, we think, correctly. The case then proceeded to trial.

The record shows that the plaintiff and several other witnesses testified to sustain the allegations of his petition, but as the controlling questions in the case must chiefly be determined upon the effect to be given plaintiff's testimony, the material parts thereof, briefly abstracted, are: That plaintiff met Foster, the defendant, for the first time on August 14, 1923; that plaintiff was walking along the street and, seeing that Foster had a board out on the street, plaintiff went in and inquired about a place on Bates' creek. Foster asked him if he had used his homestead right and plaintiff said he had not. Foster stated that he had a place twelve miles out on the Yellowstone Highway, which belonged to a lady Foster had homesteaded before; that the lady did not want her name to be known; that she wanted cash money out of it; that plaintiff, after talking with Foster, sold another piece of real estate owned by himself and wife, in order to raise money to buy the place Foster had told him about. In response to a question by plaintiff's counsel, "Did Mr. Foster state whether or not he was representing a third party or representing himself?" an objection that the question was incompetent under the pleadings was interposed by the Surety Company, which was, by the court, sustained. Plaintiff's counsel then offered to prove by the witness "that the defendant Foster represented to plaintiff that he was agent for the widow lady, and that he was working for this widow lady in the sale of the real estate; that plaintiff paid the sum of $600 to apply on the purchase price." This offer of proof was, by the court, upon objection made through the Surety Company's counsel, denied, to which ruling plaintiff saved his exception. Plaintiff also testified that Foster showed plaintiff and his wife the place under consideration; that while

showing them the place, he told them how easy it was to get water on it, what a beautiful place it was; that if he was so situated, he would like to have the place himself; that plaintiff was warned by Foster to be careful because the lady's brother-in-law, who was on the place, wanted it; that Foster did not want the brother-in-law to know that he (Foster), and plaintiff and wife were on the place; that Foster needed the money for his commission out of it; that if the brother-in-law knew that Foster was going to sell the place, he would rush to get money to buy it, because it was in the center of the place held by the brother-in-law; that Foster parked his car, in which plaintiff and wife were taken to the place, in the brush, so no one could see it from the road. On motion of counsel for the Surety Company, the court struck out plaintiff's statement that Foster said he needed the money for his commission. To this ruling an exception was reserved for the plaintiff.

Continuing his testimony, plaintiff stated that he gave Foster a check for the money on August 28, 1923; that Foster told plaintiff he would handle all correspondence through his office; that it would not be necessary for plaintiff to bother with it; that he would see that the lady relinquished the place to plaintiff; that plaintiff paid Foster $565 on August 28th by check, and plaintiff's wife paid him $20 to bind the deal just before they looked at the place; that plaintiff has received nothing for the money he paid Foster; that after the money had been paid, Foster kept telling plaintiff the papers were in Washington; that plaintiff asked Foster if it would be all right to move down on the place, and Foster saying it would be, plaintiff hauled two thousand feet of lumber down to get things built; that on the 16th of October, following, for the first time, Foster told plaintiff that he himself had filed on the place; that plaintiff's papers, supposed to be filed thereon, were in Foster's desk; that plaintiff had no filing; that the lady he was supposed to represent—"there was none;" that the lady that had owned the place had contested and had put

in a reinstatement claim. In response to the following question, "How did Mr. Foster represent himself up to that time?" the plaintiff answered: "As her agent at that time." The plaintiff further testified that on October 16th, he demanded from Foster either the place or his money, and got neither; that Foster said he would either get the place or plaintiff's money back and started a contest of the lady's claim; that about the 17th or 18th of March of the next year, Foster admitted to plaintiff that he had been beaten in the contest; that he could not get the place and did not have the money to refund to plaintiff, but that it was a just debt; that he would get the money some way and pay plaintiff; that plaintiff knew Foster was a bonded, licensed real estate agent.

On cross-examination, in response to the question, "He (Foster) didn't tell you until the 16th day of October that he had made a filing on it?" plaintiff answered: "No. He represented he was selling for somebody else." He testified also on cross-examination, that Foster told him there was some trouble in Washington, and that he should wait a few days before taking anything more down to the place; that he lost the lumber he took down. Upon the Surety Company's motion, his statement that he had lost the lumber was struck out by the court. On re-direct examination, plaintiff stated that the purchase price was $800—the balance over the amount paid to be paid upon being placed in possession.

Upon the conclusion of plaintiff's case, the court, after entering judgment against Foster, entered judgment also against the plaintiff and in favor of the Southern Surety Company, this being done upon motion of its counsel and over plaintiff's objection and exception. The defendants introduced no evidence whatsoever.

The portions of the law providing for the regulation, supervision and licensing of real estate agents in this state (Chapter 31, Session Laws of Wyoming 1921), material to the disposition of this case, are Section 1, which reads:

"It shall be unlawful for any person, firm or corporation whether operating under an assumed name or otherwise, to engage in the general business or vocation of a real estate agent, or real estate salesman, without first obtaining a license therefor from the State Immigration Commissioner of the State of Wyoming and giving a bond to the State of Wyoming, executed by two good and sufficient sureties to be approved by the State Immigration Commissioner or by a surety company duly authorized to do business in this state in the sum of one thousand dollars ($1000) guaranteeing the faithful accounting of all funds entrusted to such real estate agent or salesman, said bond to be in a form to be approved by the Attorney General, and for the use and benefit of all persons who may be damaged by the wrongful conversion of such trust funds by such real estate agent or salesman, and any person so injured or aggrieved may bring suit on such bond in his or her name without assignment thereof. All bonds given under the provisions of this act after their approval shall be filed in the office of the Immigration Commissioner."—

and certain provisions in Section 4, which read:

"A real estate agent within the meaning of this act is a person, firm or corporation, who for a compensation or valuable consideration either directly or indirectly, sells or offers for sale, buys or offers to buy, or negotiate the purchase or sale, or exchange of real estate, or leases or offers to lease, rents or offers to rent, or collects rent from real estate, or improvements thereon, for others as a vocation. * * * The provisions of this act shall not apply to any person, firm or corporation who shall perform any acts aforesaid with reference to property owned by such person, firm or corporation, or the purchase of real estate for the use of such person, firm or corporation."

It appears to be conceded that the bond, at the time of the transaction complained of, was in full force and effect. A comparison of the terms of the condition of the bond with the requirements of the statute shows that they are not quite the same, but the recitals in the instrument make it very clear that the bond was given pursuant to the statute above quoted, and necessarily it must be presumed that the

parties intended to execute such bond as the statute required. Under these circumstances, the statute became a part of the bond as much so as if incorporated in it, and the obligation should be construed in connection with the law. Franzen v. Southern Surety Company, 35 Wyo. 15, 246 Pac. 30, 46 A. L. R. 496; Mix v. Vail, 86 Ill. 40; Crawford v. Ozark Ins. Co., 97 Ark. 549, 134 S. W. 951; People v. Metropolitan Surety Co., 211 N. Y. 107, 105 N. E. 99; Chambers v. Cline, 60 W. Va. 588, 55 S. E. 999.

It is assigned as error that the judgment of the court is not sustained by sufficient evidence, and it is argued that the court erred in refusing to allow proof by the plaintiff that Foster represented that he was agent for a lady who he claimed owned the place involved in the transaction, and that Foster also stated that he needed the money for his commission. While these offers of proof were either stricken out or denied, over objection and exception, yet there is testimony which remained in the record practically to the same effect. The principal and controlling questions which thus arise in the case are, first: Were these admissions and representations of Foster admissible in evidence against the surety? and, second, if they were so admissible: What effect shall be given them as against that party?

1. On behalf of the Surety Company it was urged, in support of its objections to the testimony, and the trial court so ruled, that the representations of Foster, made to the plaintiff to the effect that he (Foster) was acting as agent for another person, were not admissible as against the surety. It is not necessary to cite authorities on the proposition that the declarations of an alleged agent made to a third person in the absence of the alleged principal, which were not brought to his knowledge or ratified by him, and not supported by other evidence, are not competent against the alleged principal to prove the fact of his agency. That appears to be the general rule. But this rule does not render evidence of the acts and declarations of the agent

incompetent as against him. In Blake v. Bremyer, 84 Kan. 708, 115 Pac. 538, 35 L. R. A. (N. S.) 165, it is said:

"As to the one who is sought to be charged as principal, the declarations of the alleged agent are hearsay. If the evidence had been offered for the purpose of binding Blake as principal, the doctrine would apply, but the evidence was offered for no such purpose. On the contrary, it was offered solely as an admission of the appellants. It is as competent to prove the admission by one that he is the agent of another, where that is the fact sought to be established against him, as it is to prove any other admission against his interest. The appellants were sued as agents. They denied agency. It was therefore competent as against themselves to prove that they had admitted that they were agents. Fisher v. Krutz, 9 Kan. 501; 31 Cyc. 1656."

In New Home etc. Co. v. Seago, 128 N. C. 158, 38 S. E. 805, where certain evidence was objected to on the ground that agency could not be proved by declarations or acts of the agent, the court said:

"This proposition is correct in a proper case, but does not apply in this case. It applies where a party is trying to establish an agency for the purpose of making the principal liable for the acts of the agent. But that is not the case here. In this case it is for the purpose of holding the agent liable."

See also Fisher v. Krutz, 9 Kan. 501, McRae v. Preston, 54 Fla. 190, 44 So. 946; Simons v. Vulcan etc. Co., 61 Pa. St. 202, 100 Am. Dec. 628; Lamb v. Lemon, 103 Kan. 607, 177 Pac. 5.

It being clear then, that the representations of Foster, concerning the capacity in which he dealt with the plaintiff, were admissible against him, we are led to consider the rule applicable where declarations of a principal admissible against him are offered in evidence in a suit wherein both the principal and surety are sued jointly, as in the case at bar.

In 2 Brandt on Suretyship, (3d Ed.) Sec. 795, it is said:

"When the suit is against the principal and surety jointly on a joint or joint and several obligation, an admission or declaration of the principal, which is competent evidence against him, is also generally held to be competent against the surety."

In Stearns on Suretyship, (3d Ed.) page 300, it is said:

"Where the principal and surety are sued jointly, the admission of the principal being competent against himself can not be excluded, and being admitted as against him, will generally be considered against the sureties."

In Brite v. Atascosa County, (Tex. Civ. App.) 247 S. W. 878, it is said:

"The rule seems to prevail that the admission of a principal will not be admitted as against the sureties in a suit in which the sureties are being sued alone but it has been held that, when there is a suit against principal and sureties on a joint obligation, the admissions of the principal, being competent evidence against him, are also competent against his sureties. Brandt, Suretyship, Sections 795-797; Amherst Bank v. Root, 2 Metc., (Mass.) 522; Singer Co. v. Reynolds, 168 Mass. 588, 47 N. E. 438, 60 Am. St. Rep. 417; Swift v. Trustees, 189 Ill. 584, 60 N. E. 44. It is also the rule that, when declarations or admissions of a principal are made in the course of the performance of the business for which the surety is bound, so as to become a part of the *res gestae*, such admissions are evidence against the surety. Brandt, Suretyship, Sec. 798; Keowne v. Love, 65 Tex. 152; Barry v. Association, 67 Tex. 250, 3 S. W. 261."

In Singer Manufacturing Co. v. Reynolds, 168 Mass. 588, 47 N. E. 438, 60 Am. St. Rep. 417, the same rule is announced in the following language:

"The defendants contend that the written statement or admission of Reynolds was not admissible in evidence against Leonard. But the action was a joint action against both. It sufficiently appears that Reynolds was the prin-

cipal, and Leonard a surety. The admission of the principal was, under our decisions, admissible against both. Martin v. Root, 17 Mass. 222, 227; Frye v. Barker, 4 Pick. 382, 384; Bridge v. Gray, 14 Pick. 55, 61; Amherst Bank v. Root, 2 Metc. 522, 541. It is urged that this doctrine should no longer be applied, because parties to actions may now testify, and because several judgments may now be rendered against joint defendants. But the doctrine has been restated by this court since those changes in practice have occurred. See Choate v. Arrington, 116 Mass. 522, 526; Dennie v. Williams, 135 Mass. 28, 29.''

We think, therefore, that the court committed error in not allowing proof to be made of the representations of Foster to the plaintiff, to the effect that he was acting as real estate agent for another.

2. This brings us to the remaining question as to the weight to be given Foster's representations, so far as the surety is concerned. The court below, as the record shows, took the view that there was no liability on the part of the surety, by reason of any representations made by Foster to plaintiff, and approved the objection of counsel for the surety, that in order to charge the latter, it must be shown that Foster was *in fact* the agent for someone else in the disposal of their property. In brief, the position is that Foster's representations as to the capacity in which he acted were not binding upon his surety.

At this point we may well pause to review certain legal principles in the law of estoppel, as applied to the relation of principal and surety. In 1 Brandt on Suretyship, (3d Ed.) Sec. 53, page 128, it is said:

''The surety or guarantor is estopped to make a defense that the principal is estopped to make.''

In Union Bank v. Beatty, 10 La. Ann. 378, it appeared that the cashier of the plaintiffs' branch bank had embezzled the funds thereof. To conceal the embezzlement, he purchased from the plaintiffs the banking house and

assets of the branch bank—these being described in the bill of sale in accordance with the list of them furnished by the cashier himself, which list was false and included various pieces of commercial paper that did not exist. The cashier gave his notes for the price, with the defendants as sureties—they, as well as plaintiffs, being ignorant of the cashier's fraudulent action. Afterwards, the cashier absconded, and his sureties claimed, in defense, that they were not bound, because they became sureties on a sale and their principal had not received the consideration thereof, and to hold them liable would be to obligate them for the cashier's defalcation and not for a purchase made by him. But the court held the sureties liable, saying that the cashier could not set up want of consideration to defeat the sale, and the sureties were in no better position.

In Bushnell v. Church, et al., 15 Conn. 406, where Bushnell was to dig ore for Church under an oral contract to dig it as fast as Church wanted it and could sell it, Bushnell was to be paid only on condition that he complied with his contract. The defendants guaranteed that Church would perform—i. e., that they would pay if he should be bound to pay and did not. Bushnell proceeded with the work and soon thereafter Church came to Bushnell and informed him that he had made a sale of six hundred tons of ore, with the direction that Bushnell dig and sort the same for market as soon as possible. This Bushnell did. Church failed to pay, and suit was brought on the guaranty. At the trial, the delarations of Church that he had sold the amount of ore stated, were offered in evidence over the objection of the defendants that this was hearsay, and received by the court. It was argued that Church's declarations were not evidence against the defendants and that they warranted he should pay for the ore he had sold, not that which he *said* he had sold. In disposing of this contention, the court remarked:

"Bushnell is labouring under William Church's directions, and to receive payment only in case he follows them, with a right, however, if in his opinion, his interests require it, to stop, after notice given. Lulled into security, by the information of William Church, that he has sold the whole quantity, he refrains from giving notice, raises the whole quantity, and when he calls for his pay, is told, that William Church was mistaken—that he thought he made the sale, but it has turned out otherwise. The man denies it, and he has no evidence of it. Who shall bear this loss? The man, who, by his direction, has been induced to do the work, or the man who directed him to do it, under the affirmation that the sale was made? William Church must be estopped, as much from averring he had made a mistake, as from averring he had told a falsehood; for the mistake, though not as criminal, is precisely as injurious to him who was the subject of it. An estoppel by an act in pais, is as complete as by a deed."

And in reference to the contention, that if the declarations of Church as to the sale of the ore were admissible against the sureties, such testimony might be rebutted, and that the defendants might show that there was no sale of the ore, the court said further:

"No evidence of that kind was offered by the defendants, and ruled out by the court; but the jury were told, that if William Church represented to the plaintiff, that he had sold the ore, and directed him to get it out as soon as possible, and the plaintiff had done the same; the plaintiff, having in pursuance of these orders done the work, would have a right to look to William Church for pay for his labour, whether Church had in fact sold or not; and that the defendants, having promised that William Church should perform his contract, must be responsible for his non-performance; and this, perhaps, warrants the construction given by the defendants to that part of the charge. We think the charge, on this point, was correct. The defendants, having warranted performance on the part of William Church, must be considered privy with him, so that if he has not complied with his engagement, they must be equally responsible with him. And although there may be cases where a party who has asserted a claim, may show he was mistaken, or where another's interest cannot be affected;

yet we understand the rule to be, that where the representations are such that another party may be presumed to have acted upon them, or upon the faith of them, and the party himself has gained some advantage, such representations are conclusive.''

Jangraw v. Perkins, 79 Vt. 107, 64 Atl. 449, was a suit to foreclose a mortgage, and it was alleged and denied that the obligation was given to secure the faithful performance of an agreement between one Revett and Jangraw, by which Revett agreed to marry his daughter and support her and her child, in consideration of the discharge of bastardy proceedings against him. Jangraw testified, over defendant's objection, that Revett had made an offer to him to marry his daughter, and admitted that he was the father of her child. The ground of the objection urged by the defendant was, as to this evidence, that it was the declaration of a third party made in the absence of the party sought to be bound by it, and was hearsay. In disposing of this contention, the court said:

''The defendant therefore stood as surety for Revett, who occupied the position of principal. Now, this relation existing, the delarations of Revett, the principal, were not hearsay. They were the declarations of the party whom the surety represented in making that defense, binding the surety to the same extent as the principal. Richardson v. Hitchcock, 28 Vt. 757; Wilson's Adm'r. v. Green, 25 Vt. 450, 60 Am. Dec. 279; Brown v. Munger, 16 Vt. 12; Campbell v. Moulton, 30 Vt. 667.''

In Dillingham v. Jenkins, 7 Smedes & Mar., (Miss.) 479, it appeared that a party, being about to buy a note signed by a principal and surety, asked the principal if it was all right, and, upon being answered that it was, purchased it. In a suit on the note against the surety, the principal being dead, it was held that the surety could not show that the note was without consideration; that the principal would have been estopped to show that fact and the surety stood in no better position.

In Bartlett v. Wheller, 195 Ill. 445, 63 N. E. 169, the court, in discussing the liability of a surety on a bond conditioned for the performance of a contract by a grain buyer, who agreed to deliver on demand the amount and kind of grain on hand, as shown by his daily reports, remarked:

"If Wheeler had made a report to the appellants on May 1, 1899, showing that he had a certain amount of grain on hand, and the appellants on the trial below had offered to prove that fact by competent evidence, then, under the rule announced in Roper v. Lodge, supra (91 Ill. 518, 33 Am. Rep. 60), appellee would have been bound by that report, whether the grain was actually on hand or not."

In Van Kirk v. Adler, 111 Ala. 104, 20 So. 336, the court, in considering the right of a surety to make defenses which the surety's principal could not interpose, used this language:

"If the plaintiff could be regarded as the guarantor of or surety for the mortgage debt, he can make no defense to its payment which the principal waives or repudiates, or by his conduct precludes himself from making, for the reason, as was said by Judge Ormond in Evans v. Keeland, 9 Ala. 42: 'If the principal could abide by the contract, and the surety repudiate it, the strange result would be produced that the principal would retain the fruits of the contract, whilst the surety would avoid the performance of his obligation, on the ground of its invalidity, in direct opposition to the acts of the principal, admitting that the contract was valid.' "

In Boone County v. Jones, 54 Iowa 699, 2 N. W. 987, 7 N. W. 155, 37 Am. Rep. 229, the court, in discussing the same principle, said this:

"The sureties can make no defense that could not be made by their principal. As is said in Patterson's Appeal, 48 P. St. 345: 'The measure of his responsibility is the measure of theirs,' and in McCabe v. Rainy, 32 Ind., 309, it is said 'any act of the principal which estops him from setting up a defense personal to himself, operates equally against his

surety.' See, also, Seaver v. Young, 16 Vermont 658, and Charles v. Hopkins, 14 Iowa 471.''

McCabe, et al. v. Rainy, 32 Ind. 309, was a case where the principal maker of a promissory note, not governed by the law merchant, was informed by Hunter that the latter was about to purchase said note, and would do so if it was good and if there was no defense to it. The principal, in response to the inquiry, advised Hunter that the note was good, that there was no defense to it and that it would be paid to him, if Hunter should purchase it. By reason of these representations, Hunter thereafter did purchase the note, and it was assigned to him. Through several subsequent assignments, plaintiff became possessed of the note. The other persons whose names were upon the note were sureties of the aforesaid principal.

In a suit against the principal and his sureties by the plaintiff to recover the face of the note, it was alleged, in defense, the fact that the note was given by the principal, and the other parties, as his sureties, for a patent right purchased of the payee (the assignor of Hunter), in connection with which the payee had made a fraudulent warranty. Another defense interposed was that the note was executed without any consideration whatsoever. Plaintiff replied first by general denial and second by way of estoppel, setting up the representations of the principal, as to the validity of the note above mentioned. This second point of the reply being demurred to, the trial court overruled the same. Appellants determining to stand thereon, judgment was entered against them and the case came up for review. In affirming the ruling below, in the course of its opinion, the Supreme Court of Indiana said:

''It is contended for the appellants, that the facts alleged in the second paragraph of the reply, even if valid as an estoppel as to Squire L. McCabe, are not so as to James Mc-Cabe and Muir, as they did not make or participate in the statements alleged therein; and that the demurrer should therefore have been sustained.

"To this it may be answered, that the patent right was not sold to James McCabe and Muir, nor was the alleged false and fraudulent warranty, set up in the answer, made to them, but to Squire L. McCabe, the principal in the note. The defense set up was not personal to them, but to their principal. They had no interest in the contract; and the defense set up is available to them because the plaintiff is not entitled to a judgment against them as sureties unless he can recover against the principal. Any act of the principal which estops him from setting up a defense, personal to himself, operates equally against his sureties."

And the court further said:

" 'An estoppel' says Lord Coke, 'is where a man is concluded by his own act or acceptance to say the truth.' A party will be concluded from denying the truth of his own admissions, which were intended to influence the conduct of another, and did so influence it, when such denial will operate to the injury of the latter. Ridgway v. Morrison, 28 Ind. 201. Here it is alleged, that Hunter, when about to purchase the note, called on the principal maker, and informed him of the fact, and asked for information concerning it, and was assured by McCabe that the note was good, that he had no defense to it, and, if Hunter purchased it, it would be paid to him; and that, relying upon said statements, Hunter did purchase it. And now, if McCabe is permitted to set up a defense existing at the time, it would be a fraud on Hunter and his subsequent assignees. That he cannot be permitted to do so, is too well settled to require a reference to the cases."

The authorities having thus defined the legal principles governing the rights of sureties to defend through their principal in certain situations, the application of these principles to the case at bar at once raises the inquiry: Could the defendant Foster set up as a defense to plaintiff's claim for the return of his money, that he (Foster) was making the sale of the relinquishment for himself and not as agent for another? Foster could show, doubtless, that he never stated to plaintiff that he was acting in the matter for another. But if it be proved by his admissions

264

that he represented to plaintiff that he was acting as agent for another, can it be that he, personally, might be heard to say, "Yes, I told you I was acting as agent for another and you paid me your money in reliance both on that statement and the fact that you knew I was a licensed and bonded real estate agent, obligated to account for the funds entrusted to me; but now I say that that was not the fact; I was acting for myself and you cannot have back your money?" We think not, and, as well said in the McCabe case, supra: "A party will be concluded from denying the truth of his own admissions, which were intended to influence the conduct of another, and did so influence it, when such denial will operate to the injury of the latter." Clearly, Foster would be estopped from denying the truth of his statements.

If Foster could not set up a defense of this sort, why should his surety be permitted to do so? This is not a defense personal to the surety. In making it, the surety was undertaking to establish the capacity in which Foster acted. The surety really represented him in making the defense. Should the surety have greater rights than he—the claim arising because of his conduct and being the same against both him and his surety? Both are sued on the same bond, too, which both signed. Should the surety be permitted to establish the fact contrary to Foster's representations, to the hurt of another, when Foster himself would not be allowed to do that? We are not inclined to think so. A contrary view would be not only to disregard the principles announced by the authorities cited above, but in large measure to render the act licensing and bonding real estate agents passed by our legislature quite valueless, so far as protecting the public is concerned. It must be borne in mind that such acts are passed for the express purpose of affording the public protection in the handling by agents of important and valuable transactions relating to real property. Firpo v. Murphy, 72 Cal. App. 249, 236 Pac. 968. Laws are to be construed in the light of the obvious purpose for which they are enacted.

Here the surety, by going on Foster's bond, made it possible for him to hold himself out to the public as a real estate agent. Assume that it had been proven that Foster, in fact, was authorized to act for another in the sale of one piece of land, but falsely represented to plaintiff that he was authorized, as agent, to sell another piece, and plaintiff, on the faith of his representations, had left purchase money with him which he converted to his own use. Certainly Foster would be estopped from claiming that he was not acting as agent at all, as to *that* piece of property. Could his surety interpose a defense of that kind in a suit against both on the bond? It is hard to see how either the principal or his surety should be, in such case, excused.

The view urged by the surety upon this court, leads directly to the position that the public must, before it deals with him, at its peril, ascertain the actual fact of whether the agent is acting for himself or another, regardless of what he may choose to represent. But how is the public to know or learn the actual fact? The agent is not bound to tell. He may, as the record shows here, say he represents a party whose name he has been forbidden to give. Our law does not require a written contract of agency to sell real estate, or that such contract be recorded. In the case of an owner residing in a far distant state or country, where the agent claims to represent him, how shall the public find out the fact of agency, even where the agent gives the owner's name, but omits or intentionally withholds the address? Must everyone refrain from dealing with the agent in such situation, except at his peril? We can hardly think the legislature so intended.

The clause of the statute reading, "The provisions of this act shall not apply to any person, firm or corporation, who shall perform any act aforesaid with reference to property owned by such person, firm or corporation, or the purchase of real estate for the use of such person, firm or corporation," seems to us to be administrative merely. It does not release a liability which other principles of law establish.

266

The clause simply excuses one who deals for himself from taking out a license and giving bond, and, of course, would relieve from the criminal punishment provided by the act for its violation. In this connection it is to be observed that the statute declares that a person who "offers for sale, buys or offers to buy or negotiate the purchase or sale * * * of real estate * * * for others as a vocation," is a real estate agent. And a single act is asserted by the statute to constitute one as such. There does not seem to be an exception in the law, providing that one is not a real estate agent, if he *offers* real estate for sale for another, when the fact is that either he or someone else whom he does not represent actually, owns the land. The statute is quite broad enough to include his representations on the point, whether true or false, and thus construed the public in dealing with such an agent will be protected.

Again, it is pleaded that plaintiff's money was entrusted to Foster for the purchase of the homestead relinquishment of the real property described in the petition. This allegation is quite capable of the construction that Foster was *plaintiff's* agent "to buy or offer to buy" the relinquishment of the land in question. There is some evidence looking to that view of the matter in the record, as Foster told plaintiff he did not need to be at any trouble in the matter; that Foster would secure the relinquishment for him from the lady, and then plaintiff paid over to Foster his money. If plaintiff's money were entrusted to the real estate agent in such capacity, and converted to the agent's own use, he and his surety would certainly be liable. It could hardly be a defense for him or his surety that, because he was actually buying for plaintiff his (Foster's) own relinquishment, which he had represented was to come from another, that both principal and surety should be released from repaying the funds so entrusted to him, and which had been misapplied.

For these reasons, we think the District Court erred in entering judgment in favor of the Southern Surety Com-

pany, and that the cause should be remanded for proceedings not inconsistent with the views expressed herein.

*Reversed.*

BLUME, C. J., and KIMBALL, J., concur.